## **TABLE OF CONTENTS**

Statements of Material Facts ..................................................................................................... 1

    A.    Statement of Undisputed Material Facts in Support of Defendants' Cross-Motion for Partial Summary Judgment ............................................................................. 2

    B.    Statement of Disputed Material Facts in Support of Defendants' Opposition to Plaintiffs' Motion for Summary Judgment ........................................................ 5

Statement of Relevant Procedural History ................................................................................. 8

Standard of Review .................................................................................................................... 9

Argument ................................................................................................................................. 10

    I.    The Court Should Deny Plaintiffs' Motion for Summary Judgment With Respect to Plaintiffs' Overtime Claims, as There is a Genuine Dispute of Material Fact of Whether the FCI Coordinators Were Exempt Employee ........................................................ 10

        A.    Employees are Exempt From Overtime Wage Laws if They Satisfy the Job Duties Test and the Salary Basis Test ............................................................. 11

            1.    Job Duties Requirement ................................................................. 11

            2.    Salary Basis Requirement ............................................................. 12

            3.    Additional Pay Beyond Normal Workweek, Including Variations in Pay, Does Not Affect Salary Basis or Exemption Status......................... 13

            4.    Improper Deductions that Do Not Comprise an 'Actual Practice' of Improper Deductions Will Not Affect Exemption Status, and Any Loss of Exemption is Limited to Time Period of Violations ..................... 14

        B.    There is a Genuine Dispute of Material Fact as to Whether the FCI Coordinators Satisfy the "Job Duties" Test Required for Exempt Status ........................................... 15

        C.    There is a Genuine Dispute of Material Fact as to Whether the FCI Coordinators Satisfy the "Salary Basis" Test Required for Exempt Status ............................... 18

        D.    Even Conceding Improper Deductions, the Proper Remedy Should be Limited to Finding of "Actual Practice," and Loss of Exemption Limited to Period When Actual Practice Occurred .................................................................. 20

    II.    Partial Summary Judgment is Necessary With Respect to All Plaintiffs Whose Minimum Wage Underpayments Were Repaid, Because Their Claims Are Either Moot or Lack Standing .......................................................................................................... 21

        A.    The Claims of All Plaintiffs Whose Minimum Wage Underpayments Were Reimbursed Must be Dismissed as Moot or Lacking Standing ........................... 22

            1.  Legal Standards on Standing, Mootness ................................................. 22

            2.  The Minimum Wage Claims for All Fully Reimbursed FCI Employees Lack Standing, or Are Now Moot ......................................................... 23

    III.    Partial Summary Judgement is Necessary With Respect to Any Claims For Treble Damages Under the MWPCL ........................................................................................ 26

        A.    Legal Standards Regarding Award of Treble Damages Under the MWPCL ............ 27

        B.    Plaintiffs Are Not Entitled to Treble Damages Under the MWPCL, But Rather Defendants Are Entitled to Judgment on This Issue, as Plaintiffs Have Presented No Evidence of Any Consequential Damages ............................... 30

    IV.    Partial Summary Judgment is Favor of Defendants is Required With Respect to Any Claims Exceeding the Two-Year Statute of Limitations, Because Plaintiffs Have Proffered No Evidence of Willfulness ........................................................... 32

     A.     Legal Standard for Willfulness and Three-Year Statute of Limitations ……………… 32

     B.     Summary Judgment Must be Granted for Defendants With Respect to
          All Claims Occurring After the Two-Year Statute of Limitations Because
          Plaintiffs Have Presented No Evidence of Willful FLSA Violations ……………….... 33

V.     The Court Must Enter Judgement as a Matter of Law for Defendants With Respect to
       All Overtime Claims Under Maryland Law for Work Weeks of 48 Hours of Less ..………… 37

VI.    Partial Summary Judgment Should be Granted for All Claims by Jennifer Bumbray
       Because Ms. Bumbray Died Before the Start of this Litigation …………………………41

VII.   Partial Summary Judgment is Required with Respect to All Class Members
       Who Have Suffered No Damages ……………………………………………………………43

Conclusion ………………………………………………………………………………… 44

## TABLE OF AUTHORITIES

**Cases**      **Page(s)**

*ABN Amro Verzekeringen BV v. Geologistics Ams., Inc.,*
   485 F.3d 85, 92-93 (2d Cir. 2007) ………………………………………………………. 23

*Admiral Mortg., Inc. v. Cooper,*
   357 Md. 533, 543 (2000) ………………………………………………………………… 27

*Allen v. Wright,*
   468 U.S. 737, 751 (1984) ………………………………………………………………… 22

*Anderson v. Liberty Lobby, Ltd.,*
   477 U.S. 242, 247-48 (1986) ………………………………………………………….9, 21

*Baden-Winterwood v. LifeTime Fitness, Inc.,*
   566 F.3d 618, 628 (6th Cir. 2009) ……………………………………………………….. 14

*BankWest, Inc. v. Baker,*
   446 F.3d 1358, 1364 (11th Cir. 2006) …………………………………………………… 22

*Behrens v. Pelletier,*
   516 U.S. 299, 309 (1996) ………………………………………………………………… 35

*Bland v. Norfolk & Southern Railroad Co.,*
   406 F.2d 863, 866 (4th Cir. 1996) ……………………………………………………….. 10

*Bouchat v. Baltimore Ravens Football Club, Inc.,*
   346 F.3d 514, 525 (4th Cir. 2003) ……………………………………………………….. 35

*Butler v. DirectSAT USA, LLC,*
   55 F. Supp. 3d 793, 802 (D.Md. 2011) ………………………………………………... 32, 33

*Campbell-Ewald Co. v. Gomez,*
   136 S.Ct. 663, 669 (2016) ………………………………………………………………… 22

*Celotex Corp. v. Catrett,*
   477 U.S. 317, 327 (1986) ………………………………………………………………. 10, 35

*Clancy v. Skyline Grill, LLC,*
   2012 WL5409733, at *8 (D.Md. Nov. 5, 2012) ………………………………………… 28

*Coppage v. Bradshaw,*
   665 F. Supp. 2d 1361, 1366 (N.D. Ga. 2009) …………………………………………… 14

*DaimlerChrysler Corp. v. Cuno,*
   547 U.S. 332, 341 (2006) ………………………………………………………………... 22

*Desmond v. PNGI Charles Town Gaming LLC,*
   630 F.3d. 351, 359 (4th Cir. 2011) ……………………………………………………. 32, 33

*Diaz v. Mi Miriachi Latin Restaurant, Inc.,*
   2019 WL528185 (D.Md. Feb. 11, 2019) ……………………………………………..… 29

*Ellis v. J.R.'s Country Stores, Inc.,*
   779 F.3d 1184, 1188 (10th Cir. 2015) …………………………………………………… 14

*Falaiye v. CCA Academic Resources, LLC,*
   Case No. PX 16-2887, 2017 WL 4098740, at *6 (D.Md. Sept. 14, 2017) …………………..... 29

*Fidelity v. Grave-Humphreys Co.,*
   818 F.2d 1126, 1128 (4th Cir. 1987) ………………………………………………………... 10

*Friedman's, Inc. v. Dunlap,*
   290 F.3d 191, 197 (4th Cir. 2002) ……………………………………………………….... 23

*Friends of Earth, Inc. v. Laidlaw Environmental Srvcs. (TOC), Inc.,*
   528 U.S. 167, 180 (2000) …………………………………………………………………… 22

*Gionfriddo v. Jason Zink, LLC,*
   769 F. Supp. 2d 880, 890 (D.Md. 2011) ……………………………………………… 32, 33

*Havey v. Homebound Mortg., Inc.,*
   547 F.3d 158, 165 (2d Cir. 2008) …………………………………………………………… 13

*Hoffman v. First Student, Inc.,*
   Civ. No. AMD 06-1882, 2008 WL11349801, (D.Md. Dec. 9, 2008) ………………………….. 18

*Hughes v. Gulf Interstate Field Svcs., Inc.,*
   878 F.3d 183, 188 (6th Cir. 2017) ………………………………………………………….... 12

*Icicle Seafoods, Inc. v. Worthington,*
   475 U.S. 709, 714 (1986) …………………………………………………………………… 11

*Kitchen v. Ickes,*
   116 F. Supp. 3d 613, 623 (2015) ……………………………………………………….….... 35

*Knox v. Service Employees,*
   567 U.S. 298, 307 (2012) ……………………………………………………………….… 22

*Korotki v. Atty. Svcs. Corp., Inc.,*
   931 F. Supp. 1269, 1273 (D.Md. 1996) …………………………………………………... 10

*Lopez v. Lawns R Us,*
   2008 WL2227353, at *4 (D.Md. May 23, 2008) …………………………………………… 28, 29

*Lovelady v. Allsup's Convenience Stores, Inc.,*
   304 Fed. Appx. 301, 304 (5th Cir. 2008) ………………………………………………... 13

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555, 560 (1992) …………………………………………………………………… 22

*Marroquin v. Canales,*
    505 F. Supp. 2d 283, 296 (D.Md. 2007) ............................................................ 27

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp,*
    475 U.S. 574, 586 (1986) ............................................................................... 9

*McLaughlin v. Richland Shoe Co.,*
    486 U.S. 128 (1988) ...................................................................................... 32

*McNeiry v. McGraw Hill,*
    919 F. Supp. 853 (D.Md. 1995) ....................................................................... 10

*Medex v. McCabe,*
    372 Md. 28, 36 (2002) .............................................................................. 39, 40

*Melendez v. Spilled Milk Catering, LLC,*
    No. PWG-18-2135, 2019 WL 2921782, at *4 (D.Md. July 18, 2019) ............................. 29

*Minix v. Canarecci,*
    597 F.3d 824, 829 (7th Cir. 2010) ................................................................... 23

*Monge v. Portofino Ristorante,*
    751 F. Supp. 2d 789, 800 (D.Md. 2010) ........................................................ 28, 29

*Morrison v. Cnty. of Fairfax, Va.,*
    826 F.3d 758, 761 (4th Cir. 2016) ................................................................... 11

*Mould v. NJG Food Service, Inc.,*
    37 F. Supp. 3d 762, 772 (D.Md. 2014) ........................................................ 33, 35

*Nilson v. Historic Inns Grp. Ltd.,*
    903 F. Supp. 905, 907 (D.Md. 1995) ................................................................ 10

*Osorio de Zavala v. Tortilleria El Volcan LLC,*
    2019 WL2366363, at *7 (D.Md. June 4, 2019) ..................................................... 29

*Perez v. Mountaire Farms, Inc.,*
    650 F.3d 350, 375 (4th Cir. 2011) ................................................................... 36

*Peters v. Early Healthcare Givers, Inc.,*
    439 Md. 646, 658 (2014) .............................................................................. 27

*Programmers' Consortium, Inc. v. Clark,*
    409 Md. 548, 563 (2009) .............................................................................. 27

*Quiroz v. Wilhelp Comm. Builders, Inc.,*
    2011 WL 5826677, at *3 (D. Md. Nov. 17, 2011) ................................................. 27

*Rebischke v. Tile Shop, LLC,*
    229 F. Supp. 3d 840, 849 (D. Minn. 2017) ........................................................ 14

*Roman v. Guapos III, Inc.,*
    970 F. Supp. 2d 407, 412 (2003) ……………………………………………………..… 37

*Ross v. Reed,*
    719 F.2d 689, 693-694 (4th Cir. 1983) ……………………………………………….… 22

*Simmons v. United Mortg. and Loan Inv., LLC,*
    634 F.3d 754, 763 (2011) …………………………………………………………….. 22

*Sylvia Dev. Corp. v. Calvert Cnty,*
    48 F.3d 810, 817-18 (4th Cir. 1995) ……………………………………………………. 10

*Trans World Airlines, Inc. v. Thurston,*
    469 U.S. 111, 125-30 (1985) …………………………………………………….......... 33

*Turner v. Human Genome Science, Inc.,*
    292 F. Supp. 2d 738, 744 (D.Md. 2003) ……………………………………………… 37, 39

*United States v. Hardy,*
    545 F.3d 280, 283 (4th Cir. 2008) ……………………………………………………… 22

*Varghese v. Honeywell Int'l, Inc.,*
    424 F.3d 411, 418 (4th Cir. 2005) ………………………………………..……….. 40

*Villatoro v. CTS & Assocs., Inc.,*
    2016 WL2348003, at *3 (D.Md. May 4, 2016) …………………………………………. 28

*Walton v. Greenbrier Ford, Inc.,*
    370 F.3d 446, 450 (4th Cir. 2004) ……………………………………………….... 11

*Watkins v. City of Montg., Ala.,*
    775 F.3d 1280, 1284 n.1 (11th Cir. 2014) ………………………………………………. 14

*Weiss v. Regal Collections,*
    385 F.3d 337, 342, 347 (3d Cir. 2004) …………………………………………………. 23

*Whiting-Turner Contracting Co. v. Fitzpatrick,*
    366 Md. 295, 303 (2001) ……………………………………………………………. 39

*Williams v. GenEx Svcs. LLC,*
    809 F.3d 103, 109 (4th Cir. 2015) …………………………………...……………… 11

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND
(Greenbelt Division)

TALIA CRAIGHEAD, et. al.,    *

    Plaintiffs    *

v.    *    Case No.: PX 17-cv-0595

FULL CITIZENSHIP    *
OF MARYLAND, INC., et. al.,

    *

    Defendants.    *

*   *   *   *   *   *   *   *   *   *   *   *   *   *

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT / DEFENDANTS' CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants, Full Citizenship of Maryland, Inc. ("FCI") and Pansy Stancil-Diaz (together, "Defendants"), by and through their undersigned attorneys Tamara B. Goorevitz, David A. Skomba, and Franklin & Prokopik, P.C., hereby submit this Memorandum of Law in Support of Defendants' Opposition to Plaintiffs' Motion for Summary Judgment / Defendants' Cross-Motion for Summary Judgment.  In support thereof, Defendants state:

### STATEMENTS OF MATERIAL FACTS

This Motion and supporting Memorandum of Law incorporates both Defendants' Opposition to the Plaintiffs' previously filed Motion for Summary Judgment, and Defendants' Cross-Motion for Partial Summary Judgment.  Accordingly, for the sake of clarity for the Court, Defendants present both a Statement of Undisputed Facts, in support of Defendants' Motion for Partial Summary Judgment, and a Statement of Disputed Facts in direct rebuttal to the statement of facts presented by Plaintiffs in their initial Motion.

A.     **Statement of Undisputed Material Facts in Support of Defendants' Cross-Motion for Partial Summary Judgment**

FCI is a private, non-profit, charitable agency that provides community-living support and vocational assistance to individuals with intellectual disabilities.  FCI has three (3) programs in which it provides services to its clients: the Residential Program, the Supported Employment Program (also referred to as the "Vocational Program"), and the Individual Support Services Program (previously known as "CSLA").  *See* FCI Answers to Interrogatories, Ex. 1, Answer Nos. 5-6.  The Residential Program provides assistance in housekeeping, personal hygiene, clothing care, shopping, money management, socialization, communication, telephone use, and age-appropriate leisure activities.  *See id.*, Answer No. 5; *see* Ex. 2, FCI Job Brochure.   FCI's Vocational Program provides assistance necessary to enable individuals to perform productive work, including on-the-job training and assistance, receiving pay, meeting or exceeding expectations of their employers and to benefit financially, socially, and in personal self-esteem of supported employment.  *See* Ex. 1, Answer No. 3.  The Residential Program is staffed with Residential Counselors and Residential Coordinators.  *See* FCI Job Descriptions, Ex. 3.  The Vocational Program is staffed with Vocational Counselors and Vocational Coordinators.[1]  *Id.*

Pansy Stancil-Diaz is the Executive Director of Full Citizenship of Maryland, Inc. ("FCI").  *See* Pansy Stancil-Diaz Affidavit, Ex. 4 at ¶ 1.  FCI does not have a policy or practice of not paying overtime to hourly employees.  *Id.* at ¶ 2.  Counselors are paid on an hourly basis and are paid 1.5 times their regular rate ("overtime"), where applicable.  *Id.* at ¶ 3-4. In contrast, Coordinators such as Plaintiffs Talia Craighead ("Craighead"), Vernesha Hutchinson ("Hutchinson"), and Pamela Ransom ("Ransom") were paid a salary, and performed exempt

---

[1] As discussed *infra* at 14 n. 13, FCI and its Coordinators understand that "Staff" and "Counselors" are one and the same, and as such for the purposes of this Motion, those two terms will be used interchangeably to refer to Residential and/or Vocational Counselors, as distinct from the FCI (Residential and Vocational) Coordinator positions held by Plaintiffs Craighead, Hutchinson, Ransom, and others.

2

duties, and therefore were treated by FCI as exempt from the overtime requirements under federal and state law.  Ex. 4 at ¶ 9.

All the Vocational Counselors and Residential Counselors identified in Plaintiffs' Motion were classified as non-exempt employees and were being paid overtime at the time of the filing of both the Complaint and Amended Complaint. *Id.* at ¶ 11.  Prior instances where Counselors were mistakenly not paid overtime as required by Maryland law in the past for regular hours worked as Vocational Counselors have been resolved or corrected, to the extent practicable.  *Id.* at ¶ 7.[2]

Employees working as Residential Coordinators, including Craighead, Hutchinson and Ransom, are no longer employed by FCI.  Ex. 4 at ¶ 8.  Ransom was employed by FCI for approximately one year, from July 22, 2015 through August 11, 2016.  *Id.*  Craighead was employed by FCI for less than a year, from July 20, 2015 until May 1, 2016.  *Id.*  Hutchinson was employed by FCI from November 2, 2015 through April 14, 2017.  *Id.*

Plaintiff, Vernice Headen, began employment with FCI on April 11, 2016.  *Id.*  FCI has a practice of paying employees every two weeks.  Ex. 4 at ¶ 11.  Therefore, Ms. Headen received the first paycheck she was owed on April 21, 2016.  *Id.*  In this paycheck, Ms. Headen was inadvertently paid only $9.00 per hour rather than $9.55 per hour.  *Id.*  However, FCI realized this error and corrected it by paying Ms. Headen the additional 55 cents an hour owed for all hours previously worked, by making a miscellaneous payment of $77.96 in the paycheck which was issued to Ms. Headen on June 16, 2016.  *Id.*; *see also* Vernice Headen Depo., ECF 192-11, at 45:13-47:15 (reaffirming her Answer to Interrogatories on this issue, and confirming that she received the $77.96 payment reimbursement and could not dispute that this amount was for reimbursement for the inadvertent minimum wage error.).

---

[2] Most of these issues were resolved by way of settlement agreements, which will be addressed by Defendants' briefing regarding the settlement agreements, to be filed with the Court on November 15, 2019. [ECF 199 and 200].

Plaintiffs have brought two distinct actions: (1) a Fair Labor Standards Act ("FLSA") claim on behalf of a proposed "collective class;" and (2) Maryland Wage and Hour Law ("MWHL") and Maryland Wage Payment and Collection Law ("MWPCL") claims on behalf of a proposed Federal Rule of Civil Procedure 23 ("Rule 23") class.  Pls.' Am. Compl., ECF 34.  Both the "collective action" and the class action were brought on behalf of "Defendants' current and former employees who were paid by the hour: and (a) were not paid the legal minimum wage in any one workweek, and/or (b) were not paid one and one-half times their regular hourly rate for hours worked in excess of 40 hours in any one workweek." *Id*.  Plaintiffs Craighead, Hutchinson and Ransom allege failure by Defendants to pay overtime wages under the FLSA and under the MWHL and MWPCL, Maryland's wage-and-hour laws.  Plaintiff Headen, however, asserts no claims against Defendants for alleged failure to pay overtime wages, and asserts only a claim for failure to pay minimum wages.  *See id*.  Headen, as noted above, was repaid in 2016 the full entirety of what she had been mistakenly underpaid.  *See* Ex. 4 at ¶ 11.  *See also*  Ex. 13, attached.

Furthermore, as noted below (*infra* at Section IV), Plaintiffs have presented no evidence during litigation in support of a claim that any wage-and-hour violations by Defendants were committed "willfully;" and Plaintiffs have presented no evidence (*infra* at Section III) suggesting or hinting at any consequential damages they may have suffered as a result of any wage-and-hour violations Defendants may have committed in this case.  Lastly, the evidence in this case (*see infra* at Section VI) makes clear that Collective Class Member Jennifer Bumbray passed away before the start of either of the two actions in this case, and as such could not have physically or legally opted into the Collective Action as Plaintiffs have continually maintained.

**B.**     **Statement of Disputed Material Facts in Support of Defendants' Opposition to Plaintiffs' Motion for Summary Judgment**

Defendants dispute Plaintiffs' Statement of Facts to the extent it describes all Plaintiffs with the position of Residential or Vocational Coordinator, as "residential staff" or hourly employees who were non-exempt employees under the law and thus entitled to overtime pay. *See* **ECF 192-1**, at 12-15, n. 1-4. During their employment with FCI, Plaintiffs Ransom, Craighead and Hutchinson worked as Residential Coordinators, in which capacity they (1) had a primary duty of management, (2) directed the work of two or more other employees, with minimal daily supervision, and (3) provided valuable, ongoing recommendations and input to upper management with respect to the hiring, firing, advancement, promotion, discipline, or other change of status of other employees in the organization. *See generally infra*, n. 2-12*; see also* Stancil-Diaz Second Affidavit, Ex. 5, at ¶¶ 2-8. Therefore, Plaintiffs Ransom, Craighead and Hutchinson were always intended to be paid on a salary basis, as salaried employees. Ex. 4 at ¶ 9.

In particular, as borne out amply during the discovery process, Plaintiffs Craighead, Hutchinson, and Ransom's primary job duties in their positions as Residential Coordinators entailed *distinctly* supervisory duties not performed by the FCI counselors they supervised. *See* Ex. 4 at ¶¶ 3-4, 9. The Coordinators' responsibilities and primary job duties involved regular supervision, coordination, management, training, evaluations, review, and/or oversight of the Residential Counselors, who in turn worked directly with the residential "clients."[3] *See* Stancil-

---

[3] *See, e.g.,* FCI Job Descriptions, **Ex. 3** (describing Residential Coordinator's responsibility to, *inter alia*, supervise residential staff and clients); Residential Coordinator Job Description and Responsibilities, **Ex. 6** (outlining job description, including requirement of "supervisory experience of at least one year;" and outlining various responsibilities, including "[s]upervise, train, and evaluate, all residential staff;" "[h]old responsibility for residential program oversight[;]" and "[f]unction as the FCI individual program coordinator for all individuals served in the FCI residential program."; Craighead Depo., **ECF 192-5**, at 53:19-54:11 (describing Residential Counselors' different job duties: to "make sure that the [clients] are safe;" that they "have food in the house, [and] that they have other basic necessities," like "[h]ot water, running water, electricity, their medication); *id*. at 76:3-76:13 (Counselor position entailed "providing assistance to [FCI] clients as they perform work," and "ensuring that [FCI] clients took prescribed medicines."). *See id*. at 17:1-17:9 (stating "yes" to question of "Any … of these coordinator positions you mentioned, they were all supervisory positions, correct?"; and "yes" to question of whether "you supervised two or more people

Diaz Second Affidavit, Ex. 5, at ¶¶ 4-5.  The Residential Coordinators also were responsible for developing and monitoring the implementation and progress of "individualized plans" ("IP"), aka "person-centered plans," for the FCI clients residing at FCI homes.[4]  And these Coordinators' primary tasks included drafting regular reports to upper management on the progress and targets of clients' IPs;[5] coordinating work schedules for Residential Counselors, and creating and overseeing work schedules for clients' daily activities;[6] overseeing disbursement of approved expense budgets for FCI house and clients' needs, and managing of expense receipts;[7] signing off on Counselor

who worked underneath you who were also employees of FCI, correct?"); *id*. at 53:8-53:12 (describing making visits to residential homes to make sure "[Residential Counselors] are doing what they are supposed to do."); *id*. at 139:2-139:9 (reporting to Ms. Stancil-Diaz on underperforming Residential Counselors).

    *See also* Hutchinson Depo, **192-6**, at 15:11-15:22 (agreeing that one role of Coordinator like herself was "supervise and direct the work of residential staff who worked in the house [she was] supervising[ ]"); *id*. at 21:13-23:20 (Coordinator corrected Counselors who made errors, and/or reported errors to Ms. Stancil-Diaz); *id*. at 32:2-32:13 (requirement to report underperforming Counselors to Ms. Stancil-Diaz); *id*. at 55:12-57:6 (discussing instances reporting to upper management Staff violations and poor performance observed on video or reported by other staff); *id*. at 78:14-78:19 (on-the-job training of Counselors regarding implementation of client "person-centered plans."); *id*. at 140:6-140:13 (drafting of annual evaluation reports regarding supervised Residential Counselors); Tanya Rose Depo., **ECF 192-8**, at 53:10-54:14 (discussing job duty of leaving notes and instructions for Counselors to complete unfinished tasks, and following up with Counselors regarding same); *id*. at 55:6-56:18 (Coordinators reporting to weekly meetings with upper management regarding issues related to Counselor work performance and client progress); *see also* Ransom Depo., **ECF 192-7**, at 25:10-25:14 (discussing job duty of "assur[ing] coordination of IP-specified programs and activities for FCI vocational staff, and appropriate day program staff of other agencies").

[4] See Craighead Depo., **ECF 192-5**, at 134:19-135:4 (describing Coordinator duty to "create a schedule for the clients, [and] work on the goals that were related to their treatment plans or ISPs[.]"); *see* Hutchinson Depo., **192-6**, at 13:14-14:12 (describing Coordinator job of ensuring client health and safety, "developing person-centered plans" or "individualized plan" for each residential client; *see id*. at 16:5-16:12 (describing role of "coordinat[ing] services" for clients, and "make sure that the plans were being followed that were developed"); *id*. at 68:6-68:14 (discussing preparing for drafting "quarterlies" reports regarding clients); *see* Hutchinson Work Logs, **Ex. 7** (showing same).

[5] *See* Hutchinson Depo., **ECF 192-6**, at 63:17-64:13 (drafted quarterly "progress reports" to be sent to upper management, regarding "the progress or lack of progress that had occurred with [a given client] during that time span"); *see also* Rose Depo., **ECF 192-8**, at 22:12-23:12; 26:14-27:2 (drafting quarterly and annual reports regarding clients' progress in IPs was solely job of Coordinators).

[6] *See* Craighead Depo., **ECF 192-5**, at 83:17-84:12 (discussing Coordinator role of creating client schedules of daily activities, "so that the clients as well as [Residential Counselors] would be aware of what we would be doing that day."); *id*. at 88:10-88:13 (same); *see* Rose Depo., **ECF 192-8**, at 27:8-2-27:12 (responsible for coordination of Counselor schedules); *see* Hutchinson Depo., **ECF 192-6**, at 67:19-68:5 (role of creating Counselor schedules); *see* Hutchinson Work Logs, **Ex. 7** (showing same).

[7] *See, e.g.,* Hutchinson Depo., **ECF 192-6**, at 58:18-63:16 (describing Coordinator responsibility of disbursing, tracking, and accounting of house budgets and client expense budgets); *see* Hutchinson Work Logs, **Ex. 7** (showing weekly logs including house and client budgeting tasks); *see* Rose Depo., **ECF 192-8**, at 23:13-23:21; 25:5-25:16 (discussing role of managing and tracking house and client expenses budgets); *see id*. at 25:21-26:12 (discussing

paysheets, and on overtime and leave requests for Counselors, and providing input to upper management regarding same;[8] and providing input to upper management with respect to hiring, discipline, promotion, and/or suspension decisions regarding Residential Counselors.[9]  *See also* Stancil-Diaz Second Affidavit, Ex. 5, at ¶¶ 4-9 (discussing Coordinators' autonomy, direct oversight and management of staff members, role in creating and managing staff schedules, role in monitoring staff performance and reporting issues to upper management, and important role in providing input and recommendations to upper management regarding hiring, advancement, and/or discipline of staff members).

Furthermore, the named Plaintiffs testified that their rate of pay, when broken down to a pro rata hourly rate, was almost double that of the FCI Counselors[10] (*see also* Stancil-Diaz Second Affidavit, Ex. 5, at ¶ 10); and that they performed many managerial tasks that Counselors never

---

Coordinator's broad role of ensuring that all items addressed by monthly budgets were purchased, and "make sure the houses have what they need.").

[8]  *See* Hutchinson Depo., **ECF 192-6**, at 69:19-70:3 (role of signing off on Counselor's submitted paysheets); *id.* at 70:12-70:20 (discussing Coordinator job duty of monitoring and signing off on Counselors' payroll timesheets); 85:10-86:5 (describing role of fielding overtime requests and providing input to Ms. Stancil-Diaz regarding same); *id.* at 86:7-86:10, 86:19-87:16 (indicating role of signing off on Counselor leave requests and providing input to Ms. Stancil-Diaz regarding same); *see* Ransom Depo., **ECF 192-7**, at 71:5-72:11 (same); *see* "Hutchinson Signed Leave Forms," **Ex. 8** (showing Hutchinson signatures on Residential Counselor requests for leave).

[9]  *See* Craighead Depo., **ECF 192-5**, at138:2-138:16 (discussing role of sitting in on interview panels, completing candidate review forms, providing feedback to upper management regarding interview candidates); *id.* at 57:19-61:10 (discussing at length her role on interview panels, and completing forms for feedback and recommendations regarding job applicants); *see also* Hutchinson Depo., **ECF 192-6**, at 34:19-36:10 (describing role of participating in hiring panels and providing feedback to upper management regarding same); *id.* at 137:14-140:3 (providing input and recommendations to Ms. Stancil-Diaz regarding termination of Residential Counselor who damaged staff property and created safety issue); *see also* Ransom depo, **ECF 192-7**, 61:19-66:20 (discussing her responsibility of reporting staff infractions and underperformance, and individual instances of same, and practice of providing input and recommendations to Ms. Stancil-Diaz regarding staff consequences); *see id.* at 143:18-144:2 (discussing role of sitting in on interview panels, and providing required input to Ms. Stancil-Diaz regarding same); Rose Depo., **ECF 192-8**, at 58:4-59:16 (discussing past examples and process of writing-up Residential Staff to Ms. Stancil-Diaz, when she observed or learned of staff mistakes, tardiness or infractions).

[10]  *Compare* Headen Pay Stubs (**ECF 72-13**), *with* Craighead, Hutchinson, and Ransom Paystubs (**ECF 72-11, -12, -14**); *see also* Ransom Depo., **ECF 192-8**, at 38:5-42:18 (discussing belief that pay for Residential Counselors was $10.00 per hour, as compared to her Coordinator salary of about $40,000.00/year); *see also* Hutchinson Depo, **ECF 192-7**, at 97:21-99:2 (discussing Coordinators' usual rate of pay of about $19.00 per hour vs. the lower starting rate of pay for Residential Counselors).  *See also* Stancil-Diaz Affidavit Exhibits 4-B to 4-E (initial hire and payroll documents indicating Residential Coordinators were hired for positions with set $40,000 salaries).

performed.[11]  *See also id.* at ¶ 11.  In many important respects the Coordinators also worked with autonomy and with limited oversight from upper management.[12]  *See also id.* at ¶¶ 2-4 (discussing limited daily oversight of Residential Coordinators, and delegation of direct staff oversight to Residential Coordinators).

Moreover, Defendants dispute Plaintiffs' statement that if the Court grants summary judgment for Plaintiffs in the entirety, the damages are "readily ascertainable."  *See* Pls.' Motion, **ECF 192-1**, at 26-27 ("If the Court grants summary judgment, the facts establishing the damages in this case are undisputed and damages amounts are readily obtainable . . . [b]ased on Defendants' payroll records, and Defendants have stipulated to their accuracy.").  Even were the Court to grant summary judgment for Plaintiffs, the scope of damages for the Plaintiffs remains very much in dispute regarding, *inter alia*, the proper overtime rate that would apply, and the matters raised herein by Defendants in their Cross-Motion, which necessarily implicate matters related to damages.

## STATEMENT OF RELEVANT PROCEDURAL HISTORY

Plaintiffs first moved the Court to conditionally certify a FLSA collective class, comprising all current or former FCI employees paid by the hour who were allegedly not paid the legal minimum wage and/or were not paid the proper overtime rate for hours worked in excess of 40 hours in any week.  ECF No. 39.  On February 16, 2018, the Court granted the motion.  ECF 78.

---

[11]  *See* Ransom Depo., **ECF 192-7,** at 74:15-75:3 (stating that only Coordinators, and not Counselors, drafted quarterly FCI reports regarding clients' person-centered plans and the progress of same); *see also* Rose Depo., **ECF 192-8**, at 26:13-27:2 (discussing how quarterly and annual reports were exclusively jobs for coordinators, not counselors); *id.* at 27:3-27:12 (preparing and managing budgets, and coordinating staff and client schedules exclusively a Coordinator duty); *id.* at 27:13-27:17 (liaising with "research coordinators" to assist at houses exclusively a job for Residential Coordinators); *id.* at 30:9-33:17 (addressing list of daily activities performed by Residential Counselors, stating that with some exceptions, those were job duties reserved for Counselors and not part of Coordinator's normal job duties).  *See also* Hutchinson Depo., **ECF 192-6,** at 63:3-64:13 (stating that managing and tracking house budgets, and preparing quarterly client reports were exclusive roles for Coordinators).

[12]  *See, e.g.,* Craighead Depo., **ECF 192-5,** at 41:3-41:16 (stating that Residential Coordinators' schedules varied according to circumstances, and she "set [her] own schedule as the residential coordinator.").

Plaintiffs also moved the Court to certify the Rule 23 class, which it defined as: "All persons who were, are, or will be employed by Defendants as Residential Coordinators and Counselors, and Vocational Coordinators and Counselors, who were paid by the hour, and were not paid the legal minimum wage and/or one and one-half time their regular hourly rate for hours worked in excess of 40 in a workweek, from March 1, 2014 through the present."  ECF No. 72.

The Court granted final certification of the Rule 23 Class in an Order issued July 27, 2018. ECF 107.  All pending litigation and discovery deadlines – including the joint submission of the proposed Rule 23 Class Notice – were temporarily stayed pending mediation.  Following unsuccessful mediation, merits discovery resumed and has now come to a close.

<u>STANDARD OF REVIEW</u>

Summary judgment upon any claim "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. Rule 56(c).

The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment … ."  *Anderson v. Liberty Lobby, Ltd.*, 477 U.S. 242, 247-48 (1986).  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (stating that when moving party has carried its burden, non-moving party "must do more than simply show there is some metaphysical doubt as to the material facts.") The "mere existence of a scintilla of evidence" in support of the plaintiff's claims is insufficient to preclude summary judgment; there must be evidence upon which a jury reasonably could find for the plaintiff. *Liberty Lobby*, 477 U.S. at 252.  Moreover, any facts proffered by a party opposing a motion for summary judgment must be in the form of admissible evidence.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  Mere speculation or conjecture is insufficient to oppose the

9

motion.  *See Sylvia Dev. Corp. v. Calvert Cnty.*, 48 F.3d 810, 817-18 (4th Cir. 1995).  A party opposing summary judgment cannot merely allude to the existence of a document or cite to merely colorable evidence to raise the specter of dispute over a material fact which would defeat a motion for summary judgment.  *Liberty Lobby*, 477 U.S. at 249-50.

A fact is "material," for purposes of summary judgment, only if, when applied to the substantive law, it affects the outcome of the litigation.  *Id.* at 248.  *See Nilson v. Historic Inns Grp. Ltd.*, 903 F. Supp. 905, 907 (D.Md. 1995); *Korotki v. Atty. Svcs. Corp., Inc.*, 931 F. Supp. 1269, 1273 (D.Md. 1996) ("Material facts are those facts which the substantive law identifies as 'facts that might affect the outcome of the suit.'").  Thus, the mere existence of a factual dispute is insufficient.  *See Liberty Lobby*, 477 U.S. at 248.  The factual dispute must affect the outcome of the suit as a matter of law, or it is irrelevant to the motion for summary judgment.

As explained by the Fourth Circuit: "The function of a motion for summary judgment is to 'smoke out' evidence to see if there is any case, i.e., any genuine dispute as to any material fact, and if there is no case, to conserve judicial time and energy by avoiding an unnecessary trial and by providing speedy and efficient summary disposition."  *Bland v. Norfolk & Southern Railroad Co.*, 406 F.2d 863, 866 (4th Cir. 1996) (as quoted in *McNeiry v. McGraw Hill*, 919 F. Supp. 853 (D.Md. 1995)).  *See also Fidelity v. Grave-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987).

<u>**ARGUMENT**</u>

I.    **THE COURT SHOULD DENY PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT WITH RESPECT TO PLAINTIFFS' OVERTIME CLAIMS, AS THERE IS A GENUINE DISPUTE OF MATERIAL FACT OF WHETHER THE FCI COORDINATORS WERE EXEMPT EMPLOYEES**

Plaintiffs' claims with respect to FCI's alleged failure to pay overtime rests on a factual foundation that is subject to genuine disputes of material fact as to whether certain supervisory employees were non-exempt employees and therefore not entitled to overtime pay.  As will be demonstrated below, because of these genuine disputes of material fact, Plaintiffs' request for

judgment as a matter of law with respect to these supervisory employees should be denied and reserved for the trier of fact to decide on the merits.

### A. Employees are Exempt From Overtime Wage Laws if They Satisfy the Job Duties Test and the Salary Basis Test.

The FLSA prohibits, for qualifying, non-exempt employees, employment "for a workweek longer than forty hours unless such employee receives compensation for [hours worked over 40 in that week] at a rate not less than [1.5 times] the regular rate at which he is employed." FLSA § 207(a)(1). *See* Md. Code, Labor & Empl. Art. ("MWHL"), § 3-415 (mirroring same overtime rule).

Certain employees are exempt from this requirement, including the "workers 'employed in a bona fide executive, administrative, or professional capacity.' " *Morrison v. Cnty. of Fairfax, Va.*, 826 F.3d 758, 761 (4th Cir. 2016) (quoting FLSA § 213(a)(1)). It is the employer's burden to prove that an employee qualifies for FLSA exemption. *Williams v. GenEx Svcs. LLC*, 809 F.3d 103, 109 (4th Cir. 2015). Whether an employee is exempt is a mixed question of law and fact. *See id.* ("The 'question of how the [employees] spent their working time ... is a question of fact. The question of whether their particular activities exclude them from the overtime benefits of the FLSA is a question of law.'") (quoting *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986)). *See Walton v. Greenbrier Ford, Inc.,* 370 F.3d 446, 450 (4th Cir. 2004). "[T]he applicability of the exemptions must be determined based on the individualized facts . . . in each case[;]" and "a fact-sensitive inquiry is required." *Morrison*, 826 F.3d at 768 (citing *Walton*, 370 F.3d at 453).

#### 1. Job Duties Requirement

Under Department of Labor ("DOL") regulations, an employee who makes more than $455 per week – such as the FCI Coordinators here – is an executive employee for exemption purposes if she also meets the "salary basis" test (*see* 29 C.F.R. § 541.602), and the "job duties" test. *See id.* at § 541.700. With respect to the latter, the employee must: (1) have a "primary duty" of

11

"management of the enterprise in which the employee is employed[;]" (2) "customarily and regularly direct[ ] the work of two or more other employees;" and (3) "ha[ve] the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." *Id.* at § 541.100(a)(2)-(4)). *See id.* at §§ 541.102-541.105.

The regulations define "primary duty" as "the principal, main, major or most important duty that the employee performs," "based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a). The DOL suggests four non-exhaustive factors for courts to consider when making this factual assessment:

> … the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

*Id. See GenEx Svcs.*, 809 F.3d at 105.

### 2.    *Salary Basis Requirement*

As for the "salary basis" prong, under the governing regulations an employee meets the salary basis test if [she] "[1] regularly receives each pay period on a weekly, or less frequent basis, [2] a predetermined amount constituting all or part of the employee's compensation, [3] which amount is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.602(a). *See Hughes v. Gulf Interstate Field Svcs., Inc.*, 878 F.3d 183, 188 (6th Cir. 2017). And while some pay deductions are permissible – e.g., for absences of at least one day for personal reasons other than sickness or disability; and "for unpaid disciplinary suspensions of [at least one day] imposed in good faith for infractions of workplace conduct rules ..." – an otherwise exempt employee "must receive [her] full salary for any week in which [she] performs any work, without regard to the number of days or hours worked." *Id.* at § 541.602(a).

12

Improper deductions from that set, predetermined amount will defeat exemption status only for the pay period during which the improper deductions were made.  *See id*. at § 541.603(b).

> ### 3. Additional Pay Beyond Normal Workweek, Including Variations in Pay, Does Not Affect Salary Basis or Exemption Status.

Importantly, employees who receive a predetermined guaranteed weekly (or less often) salary in excess of $455 per week, under the regulations, are permitted to be paid for *additional work* in excess of that predetermined amount, including different jobs with different pay rates, without affecting the salary basis requirement, so long as "the employment arrangement also includes a guarantee of at least the minimum weekly-required amount paid on a salary basis."  29 C.F.R. at § 541.604(a); *see also id.* ("[T]he exemption is not lost if an exempt employee . . . also receives additional compensation based on hours worked for work beyond the normal workweek. Such additional compensation may be paid on any basis (e.g., flat sum, bonus payment, straight-time hourly amount, time and one-half or any other basis), and may include paid time off.").

The employer may also vary hours worked by or money paid to an employee in this additional work, "beyond the normal workweek," including deductions based on performance, so long as *the predetermined amount* is not subject to improper pay deductions.  *See, e.g., Havey v. Homebound Mortg., Inc.*, 547 F.3d 158, 165 (2d Cir. 2008) ("A two-part salary scheme in which employees receive a predetermined amount, plus, on a quarterly prospective basis, an additional portion subject to deductions for quality errors does not violate the salary-basis test."); *Lovelady v. Allsup's Convenience Stores, Inc.*, 304 Fed. Appx. 301, 304 (5th Cir. 2008) ("Deductions or reductions from bonus payments do not affect an employee's [exempt] status . . . so long as the requisite minimum [ ] salary is paid."); *Coppage v. Bradshaw*, 665 F. Supp. 2d 1361, 1366 (N.D. Ga. 2009) ("[W]here an exempt employee receives additional compensation above his guaranteed minimum salary, an employer may make deductions without destroying the salary basis").

13

**4.      *Improper Deductions that Do Not Comprise an 'Actual Practice' of Improper Deductions Will Not Affect Exemption Status, and Any Loss of Exemption is Limited to Time Period of Violations.***

Notwithstanding the above, not all improper salary deductions result in total loss of FLSA exemption.  The critical question, under regulations, is whether the employer has engaged in an "*actual practice* of making improper deductions," and thereby "demonstrates that [it] did not intend to pay employees on a salary basis."  29 C.F.R. § 541.603(a).  *See Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1188 (10th Cir. 2015); *Rebischke v. Tile Shop, LLC*, 229 F. Supp. 3d 840, 849 (D. Minn. 2017).  The DOL recommends courts consider several factors in making this determination, including but not limited to: "the number of improper deductions, particularly as compared to the number of employee infractions warranting discipline; the time period during which the employer made improper deductions; the number and geographic location of employees whose salary was improperly reduced; the number and geographic location of managers responsible for taking the improper deductions; and whether the employer has a clearly communicated policy permitting or prohibiting improper deductions."  29 C.F.R. § 541.603(a).

Moreover, to the extent that the court determines that an "actual practice" of improper deductions took place, such that the employer "did not intend to pay employees on a salary basis[,]" the exemption status is lost only *"during the time period in which the improper deductions were made."  Id.* at § 541.603(b) (italics added); *accord Baden-Winterwood v. LifeTime Fitness, Inc.,* 566 F.3d 618, 628 (6th Cir. 2009); *Ellis*, 779 F.3d at 1189; *Watkins v. City of Montg., Ala.*, 775 F.3d 1280, 1284 n.1 (11th Cir. 2014).

**B.      There is a Genuine Dispute of Material Fact as to Whether the FCI Coordinators Satisfy the "Job Duties" Test Required for Exempt Status.**

Plaintiffs' request for summary judgment with respect to the Residential Coordinators' overtime claims should be denied, because there remains a genuine dispute of material fact as to

whether these Coordinator employees met the "job duties" test for exempt executive employees under FLSA regulations. *See* 29 C.F.R. at § 541.100(a)(2)-(4).

First, the employees at issue[13] held the job title of Residential Coordinators, which contrary to Plaintiffs' assertions, perform *distinctly* supervisory duties not performed by the FCI counselors they supervised. *See* Stancil-Diaz Affidavit, Ex. 4, at ¶ 9.  *See* Stancil-Diaz Second Affidavit, Ex. 5, at ¶¶ 2, 4-9.  The Coordinator responsibilities and duties of Plaintiffs Craighead, Hutchinson, and Ransom were clearly marked by supervision, training, management, evaluation, review, and/or oversight of Residential Counselors (or "staff") who worked directly with the residential "clients."[14]  The Residential Coordinators also were responsible for: developing and monitoring the implementation and progress of "individualized plans" ("IP") for FCI clients,[15] including drafting

---

[13] Plaintiffs misleadingly characterize the employees making overtime claims in this case as "Residential and Vocational Staff" (*see* ECF 192-1, at 6-7), eliding key and material distinctions between FCI's Residential and Vocational Counselors, and on the other hand Residential and Vocational Coordinators. "Staff" are best understood as "Counselors" (*not Coordinators*), an interchangeable terminology endorsed by the named Plaintiffs themselves. *See* Craighead Depo, **ECF 192-5,** at 53:13-53:20 (agreeing that "Staff" meant "Counselors" and vice versa); *see also* Ransom Depo., **ECF 192-7,** at 21:18-22:7; 28:8-28:16 (discussing how residential "staff" are really "Residential Counselors" and interchangeable terms); Rose Depo., **ECF 192-8,** at 29:15-30:8 (agreeing that residential staff and residential counselor are one and the same).  In fact, the only dispute in this case with respect to overtime claims is over employees in the position of "Coordinators," and none of the Class Representatives making overtime claims (Plaintiffs Craighead, Hutchinson and Ransom) were *Counselors,* aka "Staff."  As discussed herein, the differences between Counselors and Coordinators, in job title and job duties, are central to the issue of exemption from any overtime claims, and to the extent that Plaintiffs attempt to allege that all "staff" performed the same tasks without distinction, the Court should disregard that attempt.

[14] *See, e.g.,* FCI Job Descriptions, **Ex. 3** (describing Residential Coordinator's responsibility to, *inter alia*, supervise residential staff and clients); Residential Coordinator Job Description and Responsibilities, **Ex. 6** (outlining job description, including requirement of "supervisory experience of at least one year;" and outlining various responsibilities, including "[s]upervise, train, and evaluate, all residential staff;" "[h]old responsibility for residential program oversight[;]" and "[f]unction as the FCI individual program coordinator for all individuals served in the FCI residential program."; Craighead Depo., **ECF 192-5,** at 53:19-54:11 (describing Residential Counselors' different job duties: to "make sure that the [clients] are safe;" that they "have food in the house, [and] that they have other basic necessities," like "[h]ot water, running water, electricity, their medication); *id.* at 76:3-76:13 (Counselor position entailed "providing assistance to [FCI] clients as they perform work," and "ensuring that [FCI] clients took prescribed medicines."). *See id.* at 17:1-17:9 (stating "yes" to question of "Any ... of these coordinator positions you mentioned, they were all supervisory positions, correct?"; and "yes" to question of whether "you supervised two or more people who worked underneath you who were also employees of FCI, correct?").  *See also* additional named Plaintiffs' deposition testimony, *supra* n.2 (stating same)

[15]  See Craighead Depo., **ECF 192-5,** at 134:19-135:4 (describing Coordinator duty to "create a schedule for the clients, [and] work on the goals that were related to their treatment plans or ISPs[.]"); *see* Hutchinson Depo., **192-6,** at 13:14-14:12 (describing Coordinator job of ensuring client health and safety, "developing person-centered plans" or

15

regular reports to upper management on the progress and targets of clients' IPs;[16] coordinating work schedules for Residential Counselors, and creating and overseeing work schedules for clients' daily activities;[17] overseeing disbursement of approved expense budgets for FCI house and clients' needs, and managing of expense receipts;[18] signing off on Counselor paysheets, and overtime and leave requests for Counselors, and providing input to upper management regarding same;[19] and providing input to upper management and Ms. Stancil-Diaz with respect to hiring, discipline, and/or suspension of Residential Counselors.[20]   Furthermore, the named Plaintiffs testified that their rate of pay, when broken down to a pro rata hourly rate, was almost double that

"individualized plan" for each residential client); *see id.* at 16:5-16:12 (describing role of "coordinat[ing] services" for clients, and "make sure that the plans were being followed that were developed"); *id.* at 68:6-68:14 (discussing preparing for drafting "quarterlies" reports regarding clients); *see* Hutchinson Work Logs, **Ex. 7** (showing same).

[16] *See* Hutchinson Depo., **ECF 192-6**, at 63:17-64:13 (drafted quarterly "progress reports" to be sent to upper management, regarding "the progress or lack of progress that had occurred with [a given client] during that time span"); *see also* Rose Depo., **ECF 192-8**, at 22:12-23:12; 26:14-27:2 (drafting quarterly and annual reports regarding clients' progress in IPs was solely job of Coordinators).

[17]  *See* Craighead Depo., **ECF 192-5**, at 83:17-84:12 (discussing Coordinator role of creating client schedules of daily activities, "so that the clients as well as [Residential Counselors] would be aware of what we would be doing that day."); *id.* at 88:10-88:13 (same); *see* Rose Depo., **ECF 192-8**, at 27:8-2-27:12 (responsible for coordination of Counselor schedules); *see* Hutchinson Depo., **ECF 192-6**, at 67:19-68:5 (role of creating Counselor schedules); *see* Hutchinson Work Logs, **Ex. 7** (showing same).

[18] *See, e.g.,* Hutchinson Depo., **ECF 192-6**, at 58:18-63:16 (describing Coordinator responsibility of disbursing, tracking, and accounting of house budgets and client expense budgets); *see* Hutchinson Work Logs, **Ex. 7** (showing weekly logs including house and client budgeting tasks); *see* Rose Depo., **ECF 192-8**, at 23:13-23:21; 25:5-25:16 (discussing role of managing and tracking house and client expenses budgets); *see id.* at 25:21-26:12 (discussing Coordinator's broad role of ensuring that all items addressed by monthly budgets were purchased, and "make sure the houses have what they need.").

[19]  *See* Hutchinson Depo., **ECF 192-6**, at 69:19-70:3 (role of signing off on Counselor's submitted paysheets); *id.* at 70:12-70:20 (discussing Coordinator job duty of monitoring and signing off on Counselors' payroll timesheets); 85:10-86:5 (describing role of fielding overtime requests and providing input to Ms. Stancil-Diaz regarding same); *id.* at 86:7-86:10, 86:19-87:16 (indicating role of signing off on Counselor leave requests and providing input to Ms. Stancil-Diaz regarding same); *see* Ransom Depo., **ECF 192-7**, at 71:5-72:11 (same); *see* Hutchinson Signed Leave Requests, **Ex. 8** (showing Hutchinson signatures on Residential Counselor requests for leave).

[20]  *See* Craighead Depo., **ECF 192-5**, at138:2-138:16 (discussing role of sitting in on interview panels, completing candidate review forms, providing feedback to upper management regarding interview candidates); *id.* at 57:19-61:10 (discussing at length her role on interview panels, and completing forms for feedback and recommendations regarding job applicants); *see also* Hutchinson Depo., **ECF 192-6**, at 34:19-36:10 (describing role of participating in hiring panels and providing feedback to upper management regarding same); *id.* at 137:14-140:3 (providing input and recommendations to Ms. Stancil-Diaz regarding termination of Residential Counselor who damaged staff property and created safety issue).  *See also* additional Plaintiffs' testimony on this issue, *supra* n.8 (stating same).

of the FCI Counselors,[21] and that they performed many managerial tasks that Counselors never performed.[22]   In many important respects they also worked with autonomy and with limited oversight from upper management.[23]

In short, the record of evidence and testimony produced through discovery (much of it coming from the Class Plaintiffs themselves) is replete with examples of job requirements and job duties involving inherently supervisory and management-related tasks, with respect to the supervised FCI Residential Counselors, and with respect to the clients under their direct care and the progress of their individualized treatment plans.   Even if to some extent the job duties of Residential Coordinators overlapped with those of Residential Counselors (*see* Pls.' Motion, ECF 192-1, at 7 n.2), occasional overlap of job duties between supervisory employees and subordinates does not on its own defeat exemption status according to the "job duties" test.   *See* 29 C.F.R. § 541.700(b) (stating, "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement").   Here, there is more than sufficient evidence from a which a jury could conclude that the Residential Coordinators in these class and collective actions held exempt executive positions under the "job duties" test.

---

[21]   *Compare* Headen Pay Stubs (**ECF 72-13**), *with* Craighead, Hutchinson, and Ransom Paystubs (**ECF 72-11, -12, -14**); *see also* Ransom Depo., **ECF 192-8**, at 38:5-42:18 (discussing belief that pay for Residential Counselors was $10.00 per hour, as compared to her Coordinator salary of about $40,000.00/year); *see also* Hutchinson Depo, **ECF 192-7**, at 97:21-99:2 (discussing Coordinators' usual rate of pay of about $19.00 per hour vs. the lower starting rate of pay for Residential Counselors).

[22]   *See* Ransom Depo., **ECF 192-7**, at 74:15-75:3 (stating that only Coordinators, and not Counselors, drafted quarterly FCI reports regarding clients' person-centered plans and the progress of same); *see also* Rose Depo., **ECF 192-8**, at 26:13-27:2 (discussing how quarterly and annual reports were exclusively jobs for coordinators, not counselors); *id*. at 27:3-27:12 (preparing and managing budgets, and coordinating staff and client schedules exclusively a Coordinator duty); *id*. at 27:13-27:17 (liaising with "research coordinators" to assist at houses exclusively a job for Residential Coordinators); *id.* at 30:9-33:17 (addressing list of daily activities performed by Residential Counselors, stating that with some exceptions, those were job duties reserved for Counselors and not part of Coordinator's normal job duties). *See also* additional Plaintiffs' deposition testimony, *supra* n. 10 (stating same).

[23]   *See, e.g.,* Craighead Depo., 41:3-41:16 (stating that Residential Coordinators' schedules varied according to circumstances, and she "set [her] own schedule as the residential coordinator.").   *See* Stancil-Diaz Second Affidavit, Ex. 5 at ¶ 2-4 (addressing limited daily oversight of day-to-day job duties).

**C.     There is a Genuine Dispute of Material Fact as to Whether the FCI Coordinators Satisfy the "Salary Basis" Test Required for Exempt Status.**

Furthermore, summary judgment on the issue of exemption must be denied, because there is a genuine dispute of material fact with respect to whether the Residential Coordinators at issue satisfied the "salary basis" prong of the DOL regulations.[24]  First, the named Plaintiffs in this case made clear that they had been hired as Residential Coordinators with an agreed-upon annual salary of around $40,000.  *See* Hutchinson Depo., **ECF 192-6,** at 87:19-88:5 (discussing $40,000 starting salary); Ransom Depo., **ECF 192-7,** at 40:7-40:13; 42:11-42:18 (same).   Second, with few exceptions, the named Plaintiffs' pay stubs indicate that they were credited with 40-hour workweeks commensurate with a $40,000 salary paid in 26 bi-weekly installments.  *See* **ECF 72-11** (Craighead Paystubs); **ECF 72-12** (Hutchinson Paystubs); **ECF 72-14** (Ransom Paystubs).  In most cases, the named Plaintiffs earned a standard set payment (around $19.23 per hour) consistent with a 40-hour workweek in line with the predetermined salary noted above.

Additionally, the mere fact that according to these paystubs (and deposition testimonies), these Coordinators also occasionally worked a second position (Residential Counselor), earning a rate of $10.00 per hour, does not on its own affect their status as exempt employees, as their "employment arrangement [still] includes a guarantee of at least the minimum ($455.00) weekly-required amount paid on a salary basis."  29 C.F.R. § 541.604(a).  *See also id.* ("[T]he exemption is not lost if an exempt employee . . . also receives additional compensation based on hours worked for work beyond the normal workweek," including payments in "flat sum, bonus payment,

---

[24] Contrary to Plaintiffs' assertion in their Motion (*see* 192-1, at 7), this Court has not "concluded" that Defendants "paid Residential and Vocational Staff on an hourly basis."  Defendants maintain that they paid Residential *Counselors* on an hourly basis, as non-exempt employees, but paid Residential *Coordinators* on a salary basis, as exempt employees.  This Court naturally has not yet reached the merits of this particular dispute, a point this Court made clear in its Memorandum and Opinion Conditionally Certifying the Collective Action.  *See* **ECF 107** at 7, ("Whether certain administrative positions are ultimately exempt from overtime requirements is a merits-based determination not appropriate for resolution at the certification stage.") (citing to *Hoffman v. First Student, Inc.*, Civ. No. AMD 06-1882, 2008 WL11349801, (D.Md. Dec. 9, 2008), at *5, for proposition that whether certain positions are exempt "is an issue on the merits, to be considered properly in summary judgment practice or at trial . . ..").

straight-time hourly amount, time and one-half or any other basis. . ..").   Even where that additional payment for an additional job is subject to fluctuation – as was the case here – the salary basis test is still satisfied, and exemption status preserved, so long as there are no improper deductions to the set, predetermined salary amount for the employee.   *See id.*; *see supra*, at 13-14.

In this case, with few exceptions, the evidence creates a genuine dispute of material fact with respect to whether the Residential Coordinators met the "salary basis" test under DOL regulations.   Evidence indicates that the Residential Coordinators took their positions with an initial agreed-upon "predetermined" salary rate of $40,000 per year; that this amount was above the minimum $455 weekly pay required by regulations; and that, with few exceptions, they earned an amount on a bi-weekly basis that perfectly tracked that salary rate and was "not subject to reduction because of variations in the quality or quantity of the work performed."   29 C.F.R. § 541.602(a). The mere fact that these employees often worked varying numbers of hours in a second ("relief") job at a different ("relief") pay rate does not affect the salary-basis analysis, and should not defeat exemption status for these Coordinator class members.[25]

---

[25] In this respect, Defendants take strong issue with Plaintiffs' mischaracterization of Defendants' Responses to Request for Admission of Facts, which Plaintiffs claim as supposed proof that Defendants *admit* Plaintiffs' pay was subject to change or varied based on the number of hours worked, *ergo*, admit they were paying the salaried Coordinators on an "hourly basis."   *See* Pls.' Motion, 192-1, at 11 (citing Defs' Amended Responses to Requests for Admission, ECF 72-4).  In fact, Defendants' particular Amended Response (#5) *did not* make the admission Plaintiffs allege, but rather provides the following lengthy, and qualified, answer:

"Defendants admit that the amount of wages Plaintiff, Verenice Headen, earned while working for Full Citizenship of Maryland, Inc. varied each week depending on the number of hours she worked.

With respect to the remaining Plaintiffs, Talia Craighead, Verenesha Hutchinson, and Pamela Ransom, Defendants admit the amount of wages these Plaintiffs earned sometimes varied depending on the amount of regular hours worked combined with the amount of vacation, sick, and holiday pay available/accrued, but deny to the extent that this Request implies that these Plaintiffs were not salaried employees under the Fair Labor Standards Act.   Defendants further admit that the amount of wages these Plaintiffs earned sometimes varied depending on whether they worked Relief and if so, the number of Relief hours worked, but deny to the extent that this Request implies that Relief work involves the same duties, responsibilities, or tasks as those of a Residential Coordinator.   Defendants further deny the general statement that the amount of wages these Plaintiffs earned varied *each week*, as there were many weeks where the amount of wages earned were consistent and did not vary depending on the number of hours worked."

Defendants have not made the admission Plaintiffs allege they have; the disputes on this issue are quite clear.

**D.      Even Conceding Improper Deductions, the Proper Remedy Should be Limited to Finding of "Actual Practice," and Loss of Exemption Limited to Period When Actual Practice Occurred.**

Lastly, even conceding, that Residential Coordinators experienced occasional deductions of pay, the evidence presented creates a genuine dispute of material fact with respect to whether or not said deductions were permissible[26] and whether such deductions were of a quality, nature or frequency that amounted to an "actual practice" of improper pay deductions that would indicate Defendants "did not intend to pay [these Coordinators] on a salary basis."  29 C.F.R. § 541.603(a). Only if such an actual practice were to be found would the exemption status be disrupted by any improper pay deductions.

Lastly, were the Court to decide as a matter of law, under the evidence presented, that an actual practice of improper pay deductions had occurred with respect to the FCI Residential Coordinators in the class or collective actions, DOL regulations make clear that the exemption status for those employees would be lost not in totality, but only "during the time period in which the improper deductions were made."  29 C.F.R. § 541.603(b).

Thus, for the foregoing reasons, this Court should deny Plaintiffs' motion for summary judgment regarding whether Residential Coordinators were non-exempt, hourly employees and thus improperly denied overtime pay, as there remain genuine disputes of material fact with respect to whether these Coordinators satisfied the "salary basis" test and the "job duties" test under DOL regulations; and genuine disputes of material fact as to whether any violations that did occur were enough to constitute an actual practice of improper pay deductions.[27]

---

[26]  Indeed, as one example of permissible pay deductions, Tanya Rose was subject to pay deduction for two weeks *See* Rose Depo., **ECF-192-8,** at 95:13-96:3 (admitting that she was suspended from FCI for two weeks for misconduct, and that as per normal practice, that suspension also entailed suspension without pay).

[27]  If the Court is inclined to consider granting summary judgment for Plaintiff on the issue of whether the Coordinator employees at issue were paid on an "hourly basis" under the law, Defendants note that because of limits on Defendants

## II.    PARTIAL SUMMARY JUDGMENT IS REQUIRED WITH RESPECT TO ALL PLAINTIFFS WHOSE MINIMUM WAGE UNDERPAYMENTS WERE REPAID, BECAUSE THEIR CLAIMS ARE EITHER MOOT OR LACK STANDING

Defendants request that the Court grant summary judgment in their favor with respect to all Plaintiffs, in particular named Plaintiff Vernice Headen, whose accidental minimum wage underpayments were fully reimbursed, as all such claims, to the extent they were viable cases or controversies when litigation started, are now moot and not justiciable as a matter of law.   In addition, even if such claims are justiciable, partial summary judgment is warranted with respect to any claim for liquidated damages, as the undisputed evidence shows that any errors were clerical in nature, made unintentionally and in good faith, and promptly corrected.

### A.    The Claims of All Plaintiffs Whose Minimum Wage Underpayments Were Reimbursed Must be Dismissed as Moot or Lacking Standing

#### 1.    Legal Standards on Standing, Mootness

Article III of the Constitution limits federal-court jurisdiction to "cases" and "controversies."  U.S. Const., Art. III, § 2.  Federal courts "have 'an obligation to assure ourselves of litigants' standing under Article III."  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (quoting *Friends of Earth, Inc. v. Laidlaw Environmental Srvcs. (TOC), Inc.*, 528 U.S. 167, 180 (2000)).  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  "If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so."  *Cuno*, 547 U.S. at 341.  "The requisite elements" of this required threshold

---

or their counsel from communicating with any Class or Collective Members in this action, Defendants have been unable to get full or adequate discovery on the claims or asserted damages of other plaintiffs who are *not* Class Representatives in this case, whose positions with respect to the claims or asserted damages are arguably more biased than those of the members of the Class or Collective Actions.  Accordingly, Defendants are attaching a Federal Rule 56(f) affidavit as to all Plaintiffs in this case (*see* **Ex. 9**), as Defendants have been precluded from obtaining sufficient discovery from all Plaintiffs on the central issues in these actions, and Defendants should have an opportunity to more fully discover facts sufficient to develop an adequate defense on the issue of whether the FCI Coordinators in this case are properly exempt or non-exempt as a matter of law.  Under Rule 56(f), "summary judgment cannot be granted where the party opposing the motion can show that she needs discovery in order to establish her defenses or to pierce the plaintiff's allegations," such as 'where the nonmoving party has not had the opportunity to discover information that is essential to its opposition.' "  *Metabolife Int'l v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 n.5 (1986)).

showing of "standing" are familiar: "A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct *and likely to be redressed by the requested relief*." *Id.* at 342 (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)) (italics added).

A plaintiff who has standing, moreover, must maintain that live dispute throughout litigation, or else her claim becomes moot. *See Campbell-Ewald Co. v. Gomez*, 136 S.Ct. 663, 669 (2016) ("Federal courts have interpreted this requirement to demand that 'an actual controversy ... be extant at all stages of review, not merely at the time the complaint is filed.'"); *Simmons v. United Mortg. and Loan Inv., LLC*, 634 F.3d 754, 763 (2011). "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *United States v. Hardy*, 545 F.3d 280, 283 (4th Cir. 2008). *See Knox v. Service Employees,* 567 U.S. 298, 307 (2012) (a case becomes moot "when it is impossible for a court to grant any effectual relief whatever to the prevailing party.").

A case "can become moot either due to a change in factual circumstances, or due to a change in the law." *BankWest, Inc. v. Baker*, 446 F.3d 1358, 1364 (11th Cir. 2006). *See Ross v. Reed*, 719 F.2d 689, 693-694 (4th Cir. 1983) ("If intervening factual or legal events effectively dispel the case or controversy during pendency of the suit, the federal courts are powerless to decide the questions presented."). One important "circumstance mooting a claim arises when the claimant receives the relief he or she sought to obtain through the claim." *Friedman's, Inc. v. Dunlap*, 290 F.3d 191, 197 (4th Cir. 2002). A body of federal case law addresses the mooting effects of accepted offers of payment that afford all the relief the plaintiff may have been entitled to obtain at trial, whether via formal Civil Rule 68 Offer of Judgment (*see, e.g., Minix v. Canarecci*, 597 F.3d 824, 829 (7th Cir. 2010); *Weiss v. Regal Collections,* 385 F.3d 337, 342, 347 (3d Cir. 2004)), or via informal offer that unconditionally makes the plaintiff whole. *See ABN Amro Verzekeringen BV v. Geologistics Ams., Inc.,* 485 F.3d 85, 92-93 (2d Cir. 2007) (affirming

dismissal based on tender of maximum amount owed and not based on formal offer of judgment).

In such cases, the plaintiff's claims are considered moot and properly dismissed.

### 2.   *The Minimum Wage Claims for All Fully Reimbursed FCI Employees Lack Standing, or Are Now Moot*

Here, multiple current or former FCI employees – including named Plaintiff Headen – were temporarily underpaid according to the current applicable minimum wage, but, after FCI learned of this payroll error, the employees were then promptly reimbursed the shortfall.  Therefore, all minimum-wage claims from Headen and all Class and Collective Members who were fully repaid what they were owed, are properly considered as lacking standing, or at best currently moot, and their claims must be dismissed.  This Court has already expressed an openness to this remedy upon a showing of mootness with respect to Plaintiff Headen.  *See* Order Granting Class Certification, ECF 107, at 10 n.4 (in response to Defendants' claim that repayment to Headen rendered her minimum-wage claim non-justiciable, "If it becomes clear that Headen's claim is moot, the Court can amend its class certification order to substitute a new class representative during the pendency of this action.") (citing Fed. R. Civ. P. 23(c)(1)).

During the first nine months of 2015, FCI paid its Prince George's County-based employees who earned minimum-wage rates, $9.00 per hour.  *See* 2015 FCI Minimum Wage Pay Stubs, at Ex. 10, attached hereto.  This amount was in perfect compliance with the County minimum-wage requirements at that time.  *See* Prince George's Cnty Code, § 13A-117.  Then, for a brief time, from October 2015 to June 2016, FCI continued to pay those same Prince George's County minimum-wage employees $9.00 per hour, even though the minimum wage rate had increased to $9.55 per hour starting October 1, 2015.  *See id.*

Defendants have at all times during this litigation been candid regarding this error, which was an inadvertent error, and a mere clerical oversight (*see* Stancil-Diaz Affidavit, at Ex. 4); and

FCI, upon learning of this error, promptly repaid all employees who had been subject to the brief oversight, and sent letters to those employees explaining this fact and explaining the basis for their full repayment of underpaid wages.  *See* FCI Letters re: Underpayment, at Ex. 11, attached (indicating FCI's admission of error and attachment of pay stubs indicating the compensatory overpayment).  With respect to each of these employees who are participating in either of these actions, no evidence has been introduced suggesting that these payments were not disbursed to the employees, or that the payments that were disbursed did not fully account for the clerical error and the original underpayments.

With respect to Plaintiff Headen in particular, FCI also repaid her an amount that reflected accurate and full reimbursement for the same type of clerical shortfall, as evidenced by Ms. Stancil-Diaz's sworn statements (*see* Ex. 4 at ¶ 11), wherein it was admitted that Headen (whose first paycheck with FCI was April 21, 2016) had been underpaid according to this oversight, and that in June 2016, *before the instant litigation commenced*, Headen was promptly repaid the amount ($77.96) which she should have been paid.  *Id*.  Further proof of the full repayment is reflected on Headen's payroll records for the underpayment dates in question (*see* Headen Payroll Records, Ex. 12), and in the paystub provided to Headen that included the "miscellaneous" amount of $77.96.  *See* June 2016 Headen Pay Stub, attached as Ex. 13.

Lastly, Plaintiff Headen herself during discovery has provided no documentary evidence or sworn testimony that might tend to create a dispute of material fact with respect to whether she was properly, and promptly, made whole.   In response to Interrogatory No. 1 from FCI's 2nd Set of Interrogatories, which asked, "If you contend that you … were not reimbursed any unpaid minimum wages, state all facts and identify all witnesses and documents in support of your contention[]", Headen proffered a series of objections before "refer[ring FCI] to the First Amended Complaint, ECF No. 34, ¶¶ 14, 18-101."  *See* Ex. 14, attached hereto.  In addition, in response to

Interrogatory No. 4 from FCI's 2nd Set of Interrogatories, which asked Headen to "[s]tate the reason for the miscellaneous payment made to you by FCI on June 16, 2016 in the amount of $77.96 . . .," Headen's response was to acknowledge receipt of the check as compensation for "having received no compensation for some hours," but expressed that she "did not have understanding that this check was for unpaid minimum wages." *See* Ex. 14.  Lastly, Plaintiff Headen confirmed this repayment for underpaid wages during her deposition. *See* Headen Depo., ECF 192-11 at 45:13-47:15 (confirming her response in Answer to Interrogatory No. 4, and confirming that she received the $77.96 payment reimbursement and could not dispute that this amount was for reimbursement for the inadvertent minimum wage error).

In short, with respect to Plaintiff Headen and all other employees who were subject to this error and are partaking in this litigation, all evidence indicates that an inadvertent error was committed, that FCI admitted this fact to the underpaid employees, and that FCI corrected the error by reimbursing those employees with later miscellaneous payments on their paychecks and, in some instances, sending letters and pay stubs in 2017 to underpaid employees indicating a corrective overpayment and the reason for that overpayment.  All undisputed evidence indicates these payments made those employees whole with respect to their grievance of underpaid minimum wages, and Plaintiffs have advanced no evidence that might tend to persuade a reasonable trier of fact to the contrary.  Accordingly, given that all such employees have been fully compensated what they were owed with respect to minimum wage underpayments, none of them has a live "case or controversy" on that issue, and this Court has no subject-matter jurisdiction over their minimum-wage claims, which were completely mooted by FCI's corrective reimbursement payments.  Most importantly, given that the Class Representative's claim is moot and she lacks standing to bring this action individually and in her representative capacity,  all such claims should therefore be dismissed.

And with respect to Plaintiff Headen in particular and her claims for unpaid minimum wages, Headen is best characterized as lacking *standing* to sue in the first place.  The undisputed evidence indicates Headen had been fully reimbursed for this clerical error, and made entirely whole in 2016, *before* this litigation commenced, such that there remained no "injury in fact" or live "case or controversy" on this issue when litigation began, such as would be required to make her minimum-wage claim justiciable.  *Cuno*, *supra*, 547 U.S. at 341.  If the Court finds this position unavailing, Defendants submit that Plaintiff Headen's minimum-wage claim is at the least fully mooted, and her individual claim should be dismissed.[28]

## III.   PARTIAL SUMMARY JUDGEMENT IN FAVOR OF DEFENDANTS IS REQUIRED WITH RESPECT TO ANY CLAIMS FOR TREBLE DAMAGES UNDER THE MWPCL

Summary judgment in favor of Defendants is proper with respect to the Plaintiffs' demand for treble damages related to their claim that Defendants violated the MWPCL,[29] as Plaintiffs have presented no evidence of sustaining any consequential damages, a necessary condition for an award of treble damages pursuant to the MWPCL.  No reasonable fact finder could find otherwise on this record.

### A.     Legal Standards Regarding Award of Treble Damages Under the MWPCL

As expressed above, although state wage-and-hour statutes do permit awards of enhanced

---

[28] If the Court denies summary judgment with respect to the justiciability of any of these minimum wage claims, Defendants remind the Court that any violations were limited to the period of October 1, 2015 (when Prince George's County raised its minimum wage to $9.55 per hour) to June 2016 (when Defendants corrected their oversight). Plaintiffs suggest in their Motion (**ECF 192-1**) that Defendants violated the FLSA and/or the MWPCL by failing to pay the employees at issue the appropriate minimum wage *during all of 2015 and 2016*.  *See* **ECF 192-1**, at 13 ("Defendant's failure to pay the applicable minimum wage in 2015 and 2016 violates the FLSA.); *id*. at 14 ("[B]y paying Class Members only $9.00 per hour in 2015 and 2016, Defendants violated the MWPCL.").  The ambiguity in Plaintiffs' characterization of this issue overstates the size of these claims, and creates a risk that the Court may inflate the value of the claims beyond what they really may be.

[29] Defendants agree with Plaintiffs (**ECF 192-1** at 23 n.18) that, with respect to any plaintiffs who opted into the collective action *and* are Rule 23 Class Members, those Plaintiffs cannot simultaneously request liquidated damages under the FLSA and also treble damages under the MWPCL.  *See Quiroz v. Wilhelp Comm. Builders, Inc.*, 2011 WL 5826677, at *3 (D. Md. Nov. 17, 2011) (where violation is proven, plaintiff is "entitled to recover liquidated damages under the FLSA or treble damages under the [MWPCL], **but not both**"). (Emphasis added.)

damages, "a trier of fact 'may not award enhanced damages unless it finds that the employee's wages were not withheld as a result of a bona fide dispute.'" *Programmers' Consortium, Inc. v. Clark*, 409 Md. 548, 563 (2009). A bona fide dispute is "a legitimate dispute over the validity of the claim or the amount that is owing" such that the employer had a good faith basis for withholding payment. *Admiral Mortg., Inc. v. Cooper*, 357 Md. 533, 543 (2000). The Maryland Court of Appeals has placed the burden on the employer to prove the presence of a bona fide dispute. *See Peters v. Early Healthcare Givers, Inc.*, 439 Md. 646, 658 (2014).

The MWPCL recognizes the right to treble damages, but does not set a specified amount of enhanced damages, stating that the "plaintiff may be awarded an amount 'not exceeding three times the wage.' " *Marroquin v. Canales*, 505 F. Supp. 2d 283, 296 (D.Md. 2007) (quoting MWPCL, § 3-507.2(a)-(b)). Yet, "an employee is not presumptively entitled to enhanced damages, even if the court finds that wages were withheld without a bona fide dispute." *Peters*, 439 Md. at 661. Rather, trial courts are only "encouraged to consider the remedial purpose of the [MWPCL] when deciding whether to award enhanced damages to employees.' " *Id.* "Enhanced damages serve the dual purposes of compensating employees for consequential losses, such as late charges or evictions that can occur when employees who are not properly paid are unable to meet their financial obligations; and of penalizing employers who withhold wages without colorable justification." *Clancy v. Skyline Grill, LLC*, 2012 WL5409733, at *8 (D.Md. Nov. 5, 2012) (quoting *Lopez v. Lawns R Us*, 2008 WL2227353, at *4 (D.Md. May 23, 2008)).

"Thus, it has become customary" in this District Court "to award double damages under the FLSA, but not treble damages under the MWPCL, when the 'defendants [do] not offer any evidence of a bona fide dispute to make liquidated damages inappropriate, [but the] plaintiffs [do] not offer any evidence of consequential damages suffered because of the underpayments.' " *Villatoro v. CTS & Assocs., Inc.*, 2016 WL2348003, at *3 (D.Md. May 4, 2016) (quoting *Clancy*,

27

2012 WL5409733, at *8) (citation omitted).  *See also Lopez*, 2008 WL2227353, at *4; *Monge v. Portofino Ristorante*, 751 F. Supp. 2d 789, 800 (D.Md. 2010).  For instance, the *Lopez* Court awarded only "two times [the plaintiffs'] unpaid regular wages," explaining that although the defendants "did not offer any evidence of a bona fide dispute," plaintiffs also "did not offer any evidence of consequential damages suffered because of the underpayments."  *Lopez,* 2008 WL 2227353, at *4.  And in *Monge*, the court doubled, rather than trebled, all unpaid wages, on the ground that while the defendants failed to demonstrate a bona fide dispute, the plaintiff also had made no colorable claim of consequential damages, and had presented no evidence in support of such a claim.  *Monge*, 751 F. Supp. 2d at 800.

In their Motion for Summary Judgment, Plaintiffs recognize and concede this "customary" practice of the courts in this District to deny requests for treble damages where there is no evidence, or insufficient evidence, indicating any consequential damages suffered by the plaintiff(s).  *See* ECF 192-1 at 24 (citing case law).  However, Plaintiffs attempt to discredit this clear precedential practice by arguing (*id.* at 23-24) that: "some courts are moving away from the" consequential damages requirement, and arguing that the standards with respect to what constitutes consequential damages are insufficiently clear to warrant credence.

As to this first point, Plaintiffs' claim is unavailing.  This customary and reasonable practice in the courts of this District of insisting on evidence of some consequential damages to justify the award of treble damages, clearly survives unabated, as evidenced by the most recent case law precedent from this District on this very issue.  *See, e.g., Melendez v. Spilled Milk Catering, LLC*, Case No. PWG-18-2135, 2019 WL 2921782, at *4 (D.Md. July 18, 2019) (Grimm, P., presiding); *Osorio de Zavala v. Tortilleria El Volcan LLC*, 2019 WL2366363, at *7 (D.Md. June 4, 2019) (Day, C., presiding); *Diaz v. Mi Miriachi Latin Restaurant, Inc.*, Case No. GJH-18-636, 2019 WL528185 at *3-4 (D.Md. Feb. 11, 2019) (Hazel, G., presiding).  *See also Falaiye v.*

*CCA Academic Resources, LLC*, Case No. PX 16-2887, 2017 WL 4098740, at *6 (D.Md. Sept. 14, 2017) (Xinis, J., presiding) (collecting cases, and citing to "customary" practice, and denying request for treble damages, on ground that plaintiff "has provided no evidence of any consequential damages sustained because of [defendant's] violations."). Plaintiffs' contrary claims notwithstanding, this "customary" and equitable practice continues in this District to this day.

As to the Plaintiffs' second point, the standard is quite clear with respect to (1) what qualifies as consequential (and not merely compensatory) damages, and (2) when a plaintiff has plainly failed to show any evidence in support of such a claim. *Compare Diaz*, 2019 WL528185 at *4 (awarding plaintiff treble damages where plaintiff "asserts in his supporting declaration that he was forced to take on [extra] debt to afford basic expenses because [d]efendants did not pay him minimum wage or overtime wages."), *with Osorio*, 2019 WL2366363, at *8 (denying treble damages, as "Plaintiffs failed to attest to the consequential damages they suffered in the sworn statements included with their instant Motion . . .[, and] also did not provide any other details or evidence such as receipts or bank statements to support this claim[;]" and therefore, "I do not find Plaintiffs have shown that they in fact suffered consequential damages from the underpayments."). *See also Lopez*, 2008 WL 2227353, at *4 (plaintiffs "did not offer any evidence of consequential damages suffered because of the underpayments."); *Monge*, 751 F. Supp. 2d at 800 (doubling, rather than trebling, unpaid wages where despite absence of bona fide dispute, plaintiff did not provide evidence of any consequential damages).

**B.     Plaintiffs Are Not Entitled to Treble Damages Under the MWPCL, But Rather Defendants Are Entitled to Judgment on This Issue, as Plaintiffs Have Presented No Evidence of Any Consequential Damages.**

Here, even assuming for argument's sake only, that Plaintiffs can prove violations of the MWPCL, and also assuming Defendants cannot meet their burden of proving a "bona fide dispute" with respect to those violations, Plaintiffs have presented no evidence indicating that any of them

suffered any consequential damages arising from any of the assumed wage-and-hour violations.  In fact, none of the Plaintiffs even pled any such consequential damages.  *See* Am. Compl., ECF 34.

Furthermore, the written discovery responses from named Plaintiffs Pamela Ransom and Verenesha Hutchinson included no facts or testimony indicating or suggesting that the Plaintiffs had suffered any consequential damages:

> **INTERROGATORY NO. 6:**      If you so contend, state all facts and identify all witnesses and documents in support of your contention that, as a result of any state or federal law violations you allege against Defendants in this action, you are entitled to liquidated and/or treble damages.

With respect to Plaintiffs, the response to this interrogatory was as follows:

> **ANSWER:**      Plaintiff objects on the grounds of Overbreadth, Undue Burden, Scope, and Proportionality because this Interrogatory requires her to identify "all" facts and "all" witnesses."   Plaintiff objects on the grounds of Custody and Control because the information Defendant seeks is in the Defendants' possession.  Finally, Plaintiff objects to the extent this Interrogatory calls for a legal conclusion.  Subject to and without waiving those objections, **Plaintiff refers to their First Amended Complaint**, ECF No. 34, ¶¶ 14, 18-101.

Answer to Interrogatories No. 6 from Plaintiff Hutchinson to Defendant Stancil-Diaz.  *See also* Answer No. 5 from Plaintiff Ransom to Defendant Stancil-Diaz  (Ex. 15).

The exact same response was provided by Plaintiff Craighead, in her Answer No. 8  to the 2nd Set of Interrogatories from FCI (Ex. 14), which asked: "If you so contend, state all facts and identify all witnesses in support of your contention that, as a result of any state or federal law violations you allege against Defendants in this action, you or any Class Members are entitled to liquidated and/or treble damages."

In each instance, the named Plaintiffs referred specifically to the First Amended Complaint, which itself, as stated, made no assertions of any harms, losses or damages that might reasonably be characterized as consequential damages arising from the alleged wage-and-hour violations.  *See*

30

ECF 34, ¶¶ 14, 18-101.  And at no other stage of discovery, which is now closed,[30] have any of the named Plaintiffs introduced any evidence or provided any testimony indicating or identifying any consequential damages which they believe they have suffered as a result of the Defendants' alleged wage-and-hour violations; and in fact, when specifically asked about their Answers to Interrogatories, each of the named Plaintiffs agreed that they completed them and signed them under oath, and that their answers represented their full and final answers on the issues asked of them.[31]  As Class Representatives, in order to sustain a claim for consequential damages, these named Plaintiffs were required to present evidence of such damages on behalf of the class, but have failed to do so.

In short, and assuming (for argument's sake only) both that Defendants have committed the alleged wage-and-hour violations and that Defendants cannot prove the presence of a bona fide dispute, Plaintiffs have provided no evidence of any collateral, consequential damages they may have suffered.  Accordingly, in light of accepted case law standards and the customary practice of this district, the highest enhanced damages to which the Plaintiffs are entitled is liquidated damages, and Plaintiffs cannot, as a matter of law, claim treble damages in this case and Defendants are entitled to judgment as a matter of law on the issue of treble damages under the MWPCL.

---

[30] In this respect, Defendants challenge Plaintiffs' invitation to the Court to "reserve the issue for trial" in the event that the Court rightly insists on evidence indicating some consequential damages.  As noted above, discovery is fully closed, and Plaintiffs had their opportunity in discovery, including in response to specific interrogatories seeking evidence in support of any claim of treble damages, to put forward evidence suggesting any consequential damages. Matters such as these are ripe for summary judgment, not further discovery during trial proceedings.

[31]  *See* Craighead Depo., **ECF 192-5,** at 27:17-30:7; 116:9-117:6 (agreeing to signing Answers to Interrogatories, and specific references to Amended Complaint in Answers 8 and 9 on damages, and affirming nothing was "omitted … or that [she] would like to add."); *see* Hutchinson Depo., **ECF 192-6,** at 120:5-123:7 (same statements); *see* Ransom Depo., **ECF 192-7,** at 137:14-139:8 (same statements); *see* Rose Depo., **ECF 192-8,** at 43:14-45:3; 73:4-74:4 (same).

IV. **PARTIAL SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS IS REQUIRED WITH RESPECT TO ANY CLAIMS EXCEEDING THE TWO-YEAR STATUTE OF LIMITATIONS, BECAUSE PLAINTIFFS HAVE PROFFERED NO EVIDENCE OF WILLFULNESS**

This Court also should grant judgment as a matter of law to Defendants with respect to any aspect of the Plaintiffs' claims of FLSA violations that allegedly occurred after the expiration of the two-year statute of limitations. Because Plaintiffs have presented no evidence suggesting or even hinting at any "willfulness" by Defendants, a necessary predicate for establishing a three-year statute of limitations, the Court must rule as a matter of law that Plaintiffs are not entitled to any damages arising from any FLSA violations that might have occurred beyond the two-year statute of limitations period in this case.

A. **Legal Standard for Willfulness and Three-Year Statute of Limitations.**

Under the FLSA, "actions for alleged violations of the FLSA's minimum wage provisions 'shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued.' " *Gionfriddo v. Jason Zink, LLC*, 769 F. Supp. 2d 880, 890 (D.Md. 2011) (quoting 29 U.S.C. § 255(a)); *see Desmond v. PNGI Charles Town Gaming LLC*, 630 F.3d. 351, 359 (4th Cir. 2011). Thus, "the FLSA provides for two potential limitations periods, the application of which turns on whether the FLSA violations were conducted 'willfully' by the Defendant." *Gionfriddo*, 769 F. Supp. 2d at 890. Importantly, "[t]he employee bears the burden of proof when alleging a willful violation," with respect to violations allegedly occurring after the two-year limitations period. *Butler v. DirectSAT USA, LLC*, 55 F. Supp. 3d 793, 802 (D.Md. 2011) (citing *Desmond*, 630 F.3d at 358) (italics added).

As for what qualifies as "willful," in *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988), Justice Stevens held that it was "surely a fair reading of the plain language of the Act" that an employee alleging "willful" violations in order to extend the statute of limitations must show

32

that that the employer "either knew or showed reckless disregard for . . . whether its conduct was prohibited by the statute." *Id.* at 133 (citing to and adopting standard articulated in *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 125-30 (1985)). *See also Butler*, 55 F. Supp. 3d at 801-02 (citing *Richland Shoe*). Under this standard, "willful" is considered synonymous with "deliberate" and "intentional" (*Richland Shoe*, 486 U.S. at 133), and "[m]ere negligence on the part of the employer with regard to compliance with the FLSA is not sufficient to prove willfulness." *Gionfriddo*, 769 F. Supp. 2d at 890. *Accord Desmond*, 630 F.3d at 358 (citing *Richland Shoe*) ("Negligent conduct is insufficient to show willfulness.").

Moreover, "[a]n employer's violation of the FLSA is not willful if it is the result of a 'completely good-faith but incorrect assumption that a pay plan complied with the FLSA in all respects[;]' and therefore, 'if an employer acts unreasonably, but not recklessly, in determining its legal obligation, then' it is not acting 'willfully.' " *Mould v. NJG Food Service, Inc.*, 37 F. Supp. 3d 762, 772 (D.Md. 2014) (quoting *Richland Shoe*, 486 U.S. at 135, n.13).

**B.   Summary Judgment Must be Granted for Defendants With Respect to All Claims Occurring After the Two-Year Statute of Limitations Because Plaintiffs Have Presented No Evidence of Willful FLSA Violations.**

With discovery now complete, Defendants maintain that they committed no FLSA violations with respect to any of the Plaintiffs. Nevertheless, to the extent that the trier of fact determines that such FLSA violations occurred, Plaintiffs have advanced <u>no evidence</u> from which a jury might reasonably conclude that Defendants committed "willful" FLSA violations, as that term is widely understood to mean, as opposed to the result of "mere negligence" or actions made "unreasonably, but not recklessly." *Richland Shoe*, 486 U.S. at 135, n.13.

In Answers to Interrogatories addressing this very issue, for instance, each of the named Plaintiffs offered the same boilerplate objections and answer they proffered elsewhere in responses to Defendants' interrogatories:

**INTERROGATORY NO. 2:**       State all facts and identify all witnesses and documents in support of your contention that Defendants engaged in "willful violations" of the Fair Labor Standards Act [FLSA] violations as alleged in the First Amended Complaint.

**ANSWER:**       Plaintiff objects on the grounds of Overbreadth, Undue Burden, Scope, and Proportionality because this Interrogatory requires her to identify "all" facts and "all" witnesses."    Plaintiff objects on the grounds of Custody and Control because the information Defendant seeks is in the Defendants' possession.    Finally, Plaintiff objects to the extent this Interrogatory calls for a legal conclusion.    Subject to and without waiving those objections, Plaintiff refers to their First Amended Complaint, ECF No. 34, ¶¶ 14, 18-101.

*See* Hutchinson Answer No. 2 to FCI 2nd Set of Interrogatories, Ex. 14.  *See also* Headen Answer No. 3 to FCI's 2nd Set (identical); Craighead Answer No. 3 to FCI's 2nd Set (identical); and Ransom Answer No. 2 to FCI's 2nd Set (identical), all at Ex. 14.

Plaintiffs also have provided no evidence in deposition testimony, or through document production, supporting any potential claim of willful violations.  And as noted above, when specifically asked about their Answers to Interrogatories, each of the named Plaintiffs agreed that they completed them and signed them under oath, and that their answers represented their full and final answers on the issues asked of them.[32]

Plaintiffs have presented no evidence at all that might tend to contradict these assertions. And as noted above, the best that Plaintiffs can do is rely on *claims* of willfulness asserted in their pleadings, and to point *directly* to those pleadings in their written discovery responses.  Yet those claims in the Amended Complaint are at best express conclusory allegations, without any additional averments of facts supporting such a claim.  *See* Pls.' Am. Compl., ECF 34, at ¶ 4 (alleging, without factual support, "Defendants' willful failure to pay minimum and overtime wages in violation of [the FLSA] . . .); and at ¶ 135 (asserting, also without support, that "Defendants' FLSA violations were willful.").

---

[32] *See* Craighead Depo., **ECF 192-5**, at 27:17-30:7; 116:9-117:6 (agreeing to signing Answers to Interrogatories, and specific references to Amended Complaint in Answers 8 and 9 on damages, and affirming nothing was "omitted … or that [she] would like to add."); *see* Hutchinson Depo., **ECF 192-6**, at 120:5-123:7 (same statements); *see* Ransom Depo., **ECF 192-7**, at 137:14-139:8 (same statements); *see* Rose Depo., **ECF 192-8**, at 43:14-45:3; 73:4-74:4 (same).

A party attempting to defeat a motion for summary judgment "may not rest on his pleadings, but rather must show that specific, material facts exist that give rise to a genuine triable issue." *In re McNallen*, 62 F.3d 619, 623-24 (1995) (quoting *Celotex Corp.*, 477 U.S. at 324); *see also Behrens v. Pelletier*, 516 U.S. 299, 309 (1996); *Kitchen v. Ickes*, 116 F. Supp. 3d 613, 623 (2015) ("The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.' ") (quoting *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (in turn, quoting Fed. R. Civ. P. 56(e)).

In short, Defendants argue that they committed no FLSA violations. But even assuming they have, the evidence above indicates that any such violations were committed reasonably, without any willfulness, recklessness, or intentionality, with a "completely good-faith but incorrect assumption that a pay plan complied with the FLSA in all respects." *Mould*, 7 F. Supp. 3d at 772 (quoting *Richland Shoe*, 486 U.S. at 135, n.13).

In light of their discovery responses directing the Defendants to unsupported statements made in their Amended Complaint, the Court should not even consider the last-minute arguments Plaintiff proffer in their Motion (ECF 192-1, at Section IV), requesting judgment as a matter of law on this issue. To the extent the Court does entertain these arguments, however, they are wholly unpersuasive. First, Plaintiffs grossly misstate the burdens of proof, stating that Plaintiffs' burden of showing "willfulness" is a "light" one, an assertion not supported by any case law, nor the *Richland Shoe* citation Plaintiffs specifically offer for support. Second, Plaintiffs erroneously suggest (ECF 192-1, at 21) that to rebut a claim of "willfulness," Defendants must prove they acted in "good faith," a factual finding relevant to the question of liquidated damages (*see Perez, supra* at 16, 650 F.3d at 375), but <u>not</u> a necessary question for the court to answer when determining the issue of "willfulness" for statute of limitations purposes.

More important, Plaintiffs' claim of "willfulness" rests on evidence that does not suggest, even indirectly, that Defendants *knew* or were in *reckless disregard of* whether they were in violation of the FLSA's requirements.   Plaintiffs cite as supposed evidence the Employee Handbook provided to FCI employees (*see* ECF 90-1), which recited language indicating FCI would adhere to applicable overtime payment laws; but this proves, at best, only that Defendants knew what was in the Employee Handbook, and that Defendants knew what the law was.   It is *not* evidence indicating Defendants knew they were *violating* those standards in the course of employing or paying the employees in question.   That broader claim is purely speculative.

Plaintiffs further argue that Defendants knowledge and "notice" of alleged wage-and-hour violations in this case can be proven by the existence of prior wage-and-hour litigation against it (*see Anthony v. [FCI]*, 2015 WL6773716 (D.Md. Nov. 4, 2015)).   Again, as stated above, the time for Plaintiffs to offer this alleged supporting evidence <u>has passed</u>, and Plaintiffs should be forced to rest on their pleadings.   Still, this prior litigation does not support Plaintiffs' claim of "notice;" at best, the litigation put Defendants on notice that certain former FCI employees *were alleging* wage-and-hour violations.   Lastly, Plaintiffs assert, without factual support, that Defendants knew they had a "policy" in place that was in violation of the FLSA.   Yet, Plaintiffs do not explain for the court what this "policy" is, or what it says, and Plaintiffs do not describe in what way this alleged policy ran afoul of the FLSA's wage-and-hour laws.

In this case, it is clear Plaintiffs can do no better than *assert* in their Complaint – briefly – that Defendants committed FLSA violations that were "willful."   Plaintiffs have presented nothing more than unhelpful evidence in support of this conclusory claim, and resting on one's pleadings with respect to a mere allegation will not suffice to defeat summary judgment.   Thus, the only proper remedy for this Court is to grant partial summary judgment for Defendants with respect to any alleged FLSA violations occurring after the two-year statute of limitations had run its course.

**V.      THE COURT MUST ENTER JUDGMENT AS A MATTER OF LAW FOR DEFENDANTS WITH RESPECT TO ALL OVERTIME CLAIMS UNDER MARYLAND LAW FOR WORK WEEKS OF 48 HOURS OR LESS.**

The Court must also grant partial summary judgment for Defendants with respect to the Plaintiffs' state-law overtime claims, for every week during which a Plaintiff's workload did not exceed 48 hours.

Under the MWHL, employers are required to "pay an overtime wage of at least 1.5 times the usual hourly wage for each hour over 40 that the employee works during one workweek." *Roman v. Guapos III, Inc.*, 970 F. Supp. 2d 407, 412 (2003) (citing to MWHL §§ 3-415, 3-420). In this respect, the MWHL's overtime provisions perfectly mirror the FLSA. *Turner v. Human Genome Science, Inc.,* 292 F. Supp. 2d 738, 744 (D.Md. 2003).  However, under the MWHL, an exception to the 40-hour overtime rule exists for employees of institutions that: (i) are not hospitals, but (ii) are "engaged primarily in the care of individuals who ... [(1)] are aged, intellectually disabled, or sick or have a mental disorder; and [(2)] reside at the institution." MWHL § 3-420(d)(ii).  Under this exception, individuals falling within the scope of this provision may claim overtime ***only for hours worked over 48 hours*** during any one workweek.

This Court rejected Defendants' Motion to Dismiss the FLSA claims (*see* ECF 76).  A key component of Defendants' argument in their Motion (*see* ECF 67) was that FCI was not subject to the FLSA, because it was not an institution "engaged in the operation of a hospital" or "primarily engaged in the care of the sick, the aged, or the mentally ill or defective who reside on the premises of such institution."  *Id.* at 6 (quoting 29 U.S.C. § 203(s)(1)).  By openly rejecting this argument, and denying Defendants' Motion, the Court found that subject matter jurisdiction *did* exist, and that Defendants *were* subject to the FLSA claims, as FCI operated as an institution that "primarily engaged in the care of the sick, the aged, or the mentally ill or defective who reside on

the premises … ."  The Court's conclusion on this issue was readily apparent during the hearing on the motion to dismiss.

Thus, for purposes of MWHL § 3-420(d)(2), the Court has already held that FCI is among that group of non-hospital institutions which are "engaged primarily in the care of individuals who ... are aged, intellectually disabled, or sick or have a mental disorder; and [who] reside at the institution," and which therefore must pay overtime wages to only those employees whose weekly workload exceeds *48 hours* (and not 40 hours) in any workweek.  Plaintiffs do not contest this conclusion in their Motion for Summary Judgment, nor would they have a basis to do so.

In their Complaint, Plaintiffs allege that MWHL § 3-415 "requires employers to pay non-exempt employees one and one-half times their effective regular hourly rate for hours worked in excess of 40 hours in any one workweek" (ECF 34 at ¶ 139); and they allege "Defendants violated the MWHL by knowingly failing to pay Plaintiffs and similarly situated individuals at least one and one-half times their regular hourly rate for hours worked in excess of 40 hours in any one workweek." *Id.* at ¶ 140.  *See id.* at ¶¶ 51-56, 63-68, 83-88.  Plaintiffs clearly have argued that FCI is subject to the usual statutory 40-hour overtime rule that does not apply.

In their Motion, Plaintiffs have abandoned their MWHL argument from their Complaint, and now argue that under the MWPCL, Plaintiffs with overtime claims are entitled to a 40-hour overtime standard because Defendants, in the "Employee Handbook" provided to FCI employees (*see* ECF 90-1), promised their employees overtime pay for hours worked in excess of *40 hours*. *See* Pls.' Motion, at 11-12.[33]  Plaintiffs' reason that: (1) the MWPCL allows for payment of all "wages," i.e., "all compensation" that "is due to an employee," including any "remuneration promised" "for services" performed (*see* MWPCL §§ 3-501(c), 3-502)); (2) that the Employee

---

[33] The language Plaintiffs cite to states that: "Non-exempt employees (i.e., hourly employees and salaried non-exempt employees) will be paid overtime, at a rate of 1.5 times the employee's regular rate of pay, for all hours worked in excess of 40 hours in the employee's work week."  **ECF 90-1**, at 14.

38

Handbook constitutes an employment agreement, and the 40-hour language is a binding promise of a 40-hour overtime policy; and (3) notwithstanding the 48-hour rule recited above, this 40-hour overtime language amounts to "remuneration promised" under the MWCPL, and thus Defendants were required to pay all non-exempt employees in accordance with that promise. *See id.* at 12.

Plaintiffs' argument about the significance of this 40-hour language is unpersuasive. Defendants acknowledge that, as per case law discussing the MWPCL, "wages" due to employees include "remuneration promised" for work performed, including all non-discretionary bonuses. *See Whiting-Turner Contracting Co. v. Fitzpatrick*, 366 Md. 295, 303 (2001) (holding, "the wages which an employee is due, and which must be paid on termination of employment, consist of all compensation, and any other remuneration, that the employee was promised in exchange for his work."); *accord Medex v. McCabe*, 372 Md. 28, 36 (2002) ("Where the payments are dependent upon conditions other than the employee's efforts, they lie outside of the definition."). Cases addressing this issue have largely focused on whether bonuses or commissions built into "promised" pay had "vested" in the employee, or whether the employee had satisfied all conditions for receipt of the additional payment. *Compare Medex*, 372 Md. at 36-37 (employee was entitled to incentive-based bonuses spelled out in employment manual and Incentive Plan, as "incentive fees were related directly to [employee] sales…[,]" and "McCabe had performed all the work necessary to earn the fees"), *with Fitzpatrick*, 366 Md. at 303-06 (employee not entitled to commissions set forth in compensation agreement, as commissions were conditioned on employment for two years, yet employee's departed employer before he satisfied that condition).

However, in each of these cases, there was <u>no question that there was some underlying employment agreement or contract</u>; the only real issue being whether the employee "had performed all the work necessary to earn the fees," such that he was entitled to receive the "remuneration promised." As a threshold matter, courts have "focused on the existence of an

employment agreement laying out the terms of compensation to establish the existence or non-existence, of a promise." *Varghese v. Honeywell Int'l, Inc.*, 424 F.3d 411, 418 (4th Cir. 2005) (citing *Fitzpatrick*, 366 Md. at 305-06, and *Medex*, 372 Md. at 42).

In the instant case, however, Plaintiffs have presented no such employment agreement or binding promise of remuneration, instead proffering only the FCI Employee Handbook, which by its own description does not constitute an employment agreement or contract, and is intended to be but a "summary" of FCI "guidelines."  On the first page of text after the cover sheet, for instance, the Handbook makes explicit: "The contents of this handbook represent a summary of guidelines regarding operations of FCI, and should not be construed as a contract or employee agreement. . .." ECF 90-1, at 2. (Emphasis added.)  Additionally, in the "Acknowledgment of Receipt of Employee Handbook" accompanying the Employee Handbook, and signed by FCI employees receiving it ("the Acknowledgment," *see* ECF 90-1 at 28), the employee acknowledges a separate "employment relationship with FCI" into which "I have entered into ... voluntarily."  *Id*. at ¶ 1. However, the Acknowledgment specifically states: "I understand that this handbook is neither a contract of employment nor a legally-binding agreement[;]" and "I have had an opportunity to read the handbook, and I understand that I may ask my supervisor or … the Human Resources Department any questions I might have concerning the handbook."  *Id*. at ¶ 4.  Lastly, in direct contradiction of the 40-hour language Plaintiffs cite to, page 7 of the Handbook states that "[i]t is FCI's policy to pay employees for all hours worked and to comply with all applicable wage and hour requirements under federal, state and local law," and directing employees to "see your manager" "[i]f you would like a copy of the wage and hour policies applicable to your location."

In short, this Handbook is not an employment agreement, it does not purport to act as a stand-in for or replication of an employment agreement, and the Handbook does not purport to articulate the full terms of employment, or any agreed-upon salaries, wages, or other forms of

consideration arising from any employment agreement.  The employees receiving this "summary of … guidelines" acknowledged as much when signing their name to the Acknowledgment.

Therefore, the 40-hour overtime language Plaintiffs cite to cannot fairly be characterized as "remuneration promised" by Defendants, and therefore not "wages due" to Plaintiffs under the MWPCL.  On the discrete issue of overtime requirements, Defendants are bound only by state and federal law (in this case, MWPCL § 3-420(d)(2)), and *not* by non-binding language in a non-binding employee manual.  Therefore, Plaintiffs' claim that they are entitled to overtime payments under Maryland law for hours worked above 40 hours should be denied, and the Court should enter judgment as a matter of law that Plaintiffs may claim overtime violations under Maryland law only for weeks in which they worked in excess of 48 hours.

## VI.   PARTIAL SUMMARY JUDGMENT SHOULD BE GRANTED FOR ALL CLAIMS BY JENNIFER BUMBRAY BECAUSE MS. BUMBRAY DIED BEFORE THE START OF LITIGATION

Defendants also request that the Court enter partial summary judgment with respect to any claims as applied to Class Member Jennifer Bumbray, as Ms. Bumbray passed away one year before the instant litigation commenced, and no aspect of state or federal law permits a previously deceased person to participate in class or collective action litigation, or for any representative for the Estate of a deceased person to do the same.

On March 17, 2017, Plaintiffs filed their initial Complaint in this case.  On June 13, 2018, after the Collective Class had been conditionally certified and Notice regarding said action had been disseminated, Plaintiffs filed with this Court a "Consent to be an Opt-In Plaintiff" (ECF 97, attached as Ex. 16) wherein Jennifer Bumbray miraculously expressed her "consent to be a plaintiff in the lawsuit *Craighead v. Full Citizenship of Maryland, Inc.*, U.S. District Court, District of Maryland . . .."  *Id.* at ¶ 1.  This decision seemed further confirmed by Ms. Bumbray's typed name and her apparent personal signature on the Consent to Opt-In.  *See id*.

41

On August 13, 2019, Plaintiffs filed a Notice to "notify the Court of the death of Class and Collective Member Jennifer Bumbray *during the pendency of this action*."  ECF 183, attached as Ex. 17 (italics added).  Plaintiff informed the Court that "pursuant to Rule 25(a)(1), within 90 days of service of this statement, Plaintiffs will notify the Court if there is an executor of Ms. Bumbray's estate who will request to substitute [sic] Ms. Bumbray as legal representative in this action."  *Id*.  Undersigned counsel then contacted Class Counsel, specifically mentioning this Notice, and asking Counsel to "please advise as to when Plaintiffs contend Ms. Bumbray died?", to which Class Counsel in response wrote that Ms. Bumbray died on March 3, 2016,[34] and that "[w]e will be filing a corrective notice with the Court tomorrow regarding the date of Ms. Bumbray's death."  *See* Email Correspondence re Bumbray, attached as Ex. 18.  A corrective notice was filed the following day [*see* ECF 184], in which Class Counsel informed the Court, ambiguously, that they had "learned of the death of Class and Collective Member Jennifer Bumbray during the pendency of this action," and again recited the statement of above regarding whether an executor might act as a substitute for Ms. Bumbray's claims moving forward.  *Id*.

In light of Class Counsel's email confirming Ms. Bumbray's death on March 3, 2016, it is completely unclear why an ambiguous "corrective notice" regarding Ms. Bumbray's death was issued by Plaintiffs, whereas Plaintiffs declined to withdraw Ms. Bumbray completely from the Class and Collective actions.  When this case began, Ms. Bumbray had been deceased already for one year, and when Ms. Bumbray's Consent to Opt-In was filed with the Court (signed by whom, it is not known), Ms. Bumbray was still deceased.  She was obviously not capable of signing her name to the Consent to Opt-In (shown in Ex. 16), which raises the obvious question: *who signed the Consent to Opt-In*?  Ms. Bumbray was physically incapable of initiating any claims with

---

[34] Defendants have confirmed the date of death independently, according to obituaries Defendants were able to locate indicating the date of Ms. Bumbray's passing.  *See* Ex. 19, attached hereto.

respect to any wage-and-hour violations Defendants might have committed when she was alive.

In short, all parties to this case know that Ms. Bumbray's death preceded the start of the instant litigation, and preceded the date of her mystery signed Opt-In Notice, and therefore the only legally permissible remedy, in light of these facts, is for the Court to dismiss Ms. Bumbray's claims in their entirety from this litigation.

## VII.   PARTIAL SUMMARY JUDGMENT IS REQUIRED WITH RESPECT TO ALL CLASS MEMBERS WHO HAVE SUFFERED NO DAMAGES

Lastly, Defendants request that the Court grant partial summary judgment with respect to any FLSA claims by persons who opted-in to the Collective Action, but who, according to the undisputed evidence, have endured no FLSA violation and are entitled to no damages.

In total, aside from the four named Plaintiffs, of all the individuals who opted-in to the Collective Action, a full 13 of them have advanced no evidence that they are entitled to any damages as part of the Collective Action, and in fact it is apparent from Plaintiffs' own discovery responses that these 13 persons were not subject to any overtime or minimum wage FLSA violations.  This is not just Defendants' claim; it is evidenced by Plaintiffs' own itemized damages worksheet, which they produced for Defendants as attachments to Plaintiff Craighead's discovery responses in order to better explain the Plaintiffs' computation of alleged damages.  That damages worksheet, attached as Ex. 20, indicates the persons to whom Plaintiffs allege damages are owed, arising from alleged wage-and-hour violations by Defendants.  A review of this worksheet will confirm that of all the persons with separate sheets indicating alleged damages, *only six* of those persons are among the list of Opt-in Plaintiffs.  *See id.*  None of the remaining opt-in Plaintiffs in the Collective Action were included among the worksheet showing those with asserted damages.

This finding is consistent with Defendants' own review of FCI payroll documents related to these 13 persons, which confirm that no violations occurred, and that no damages are owed to

these 13 persons.  Plaintiffs to date have produced no other evidence during discovery that might tend to suggest, in contrast to the worksheet in Ex. 20, that these other opted-in Plaintiffs were in any wronged under the FLSA, or that they have suffered any damages for which compensation is required.  Without any such evidence, these Plaintiffs simply have no legally viable claims in this case, and therefore, with merits discovery now at a close, Defendants request that the Court enter judgment as a matter of law with respect to the claims of all opted-in Plaintiffs with no asserted damages, and that all such opted-in Plaintiffs' claims be dismissed in their entirety.

CONCLUSION

**WHEREFORE**, Defendants, Full Citizenship of Maryland, Inc., and Pansy Stancil-Diaz, are entitled to partial judgment as a matter of law as to all the foregoing issues.  Defendants respectfully request that this Court grant their Motion for Partial Summary Judgment as to all issues presented, deny Plaintiffs' Motion for Summary Judgment in its entirety, and grant Defendants further relief as may be allowed, and as justice and the nature of its cause may require.

Respectfully submitted,

/s/ *Tamara B. Goorevitz*

Tamara B. Goorevitz (Federal Bar No.: 25700)
David A. Skomba (Federal Bar No.:23664)
FRANKLIN & PROKOPIK, PC
Two North Charles St., Ste. 600
Baltimore, Maryland 21201
Tel.: (410) 230-3625
Fax: (410) 752-6868
tgoorevitz@fandpnet.com
dskomba@fandpnet.com
*Attorneys for Defendants, Full Citizenship of Maryland, Inc., and Pansy Stancil-Diaz.*